**FRANK IREY, JR., INC., a corporation, Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION et al., Respondents.**

**No. 73–1765.**

United States Court of Appeals, Third Circuit.

Argued June 13, 1974.

Decided Nov. 4, 1974.

Reargued May 8, 1975.

On Hearing En Banc July 24, 1975.

Oliver N. Hormell, California, Pa., McNeill Stokes, Stokes, Boyd & Shapiro, Atlanta, Ga., for petitioner.

Irving Jaffe, Acting Asst. Atty. Gen., Stephen F. Eilperin, Michael H. Stein, Neil H. Koslowe, Dept. of Justice, Washington, D. C., for respondents; William J. Kilberg, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, Michael H. Levin, Counsel for Appellate Litigation, Ann Mason Noble, Washington, D. C., of counsel.

Before STALEY, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The petitioner employer launched a broad based attack on the Occupational Safety and Health Act in this appeal. After a careful review of the record, we find that most of the assault stops short and that the constitutional challenges to the statute must fail. However, on one point there was error, and we conclude that the Occupational Safety and Health Review Commission applied an improper definition of the word "willful" in assessing one of the penalties against the petitioner. We remand for further consideration of that violation.

An employee of petitioner, Frank Irey, Jr., Inc., was killed on January 11, 1972, when a side of the trench in which he was working collapsed onto him. As a result of this tragedy, a Compliance Officer of the Occupationl Safety and Health Administration performed an inspection of the work site and determined that the Irey Company had violated a number of OSHA's standards. A citation was issued charging that the employer failed to properly shore the trench and that other violations had occurred as well.

Irey was a contractor which was performing a construction subcontract in

Morgantown, West Virginia awarded by the Boeing Company. That organization had caused certain test borings to be made in order to determine soil conditions, and the resulting information was made available to the petitioner. Irey was aware of the safety requirements for trenching work since its contract proposal to Boeing reiterated the OSHA standards in substance.

In November of 1971, West Virginia state safety inspectors cited Irey for permitting workers to be in a trench fifteen feet deep, the bottom portion of which appeared to be rock but the upper sides of which were composed of soft earth with substantial water content. Harley Six, the petitioner's construction superintendent, ordered a backhoe operator to slope the sides of the trench, and the inspectors then permitted work to continue. The company was cautioned orally and in writing of the necessity for shoring or sloping the sides of trenches composed of unstable ·or soft material and of the added dangers posed by water accumulation in the soil.

On the day before the fatal accident, a trench was dug about 75 feet to 100 feet from the one which had come to the attention of the West Virginia inspectors some six weeks earlier. This new trench was started by blasting through solid rock. On the following day, softer material was reached, and a backhoe was used for the digging. The trench was about 33 inches wide and was taken down to a depth of about 7½ feet. The sides of the trench were vertical and had not been shored. Some rain had fallen

during the previous night, and water was pumped out from the 6 to 10 feet area of the trench which had been left open. The decedent then began to lay pipe on the bottom, and thereafter backfill consisting of limestone chips was put into the excavation. It was about noon when the accident occurred.

At the hearing before the OSHA examiner, superintendent Six testified that he thought he was digging in shale and that consequently the trench did not have to be shored according to OSHA regulations.[1] He referred to test boring reports which he said described the soil in the area as brown to dark brown weathered shale with silty clay seams.

The employer also called a soils expert who performed some test borings in the vicinity of the accident some months afterward. This witness described the area as being of weathered limestone which, although similar to weathered shale in appearance, has more of a tendency to slide, particularly when wet.

The hearing officer found that the petitioner was guilty of a willful violation of § 5 of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 654 (1970), (the general duty section of the Act) and of the standards relating to support of trenches published at 29 C.F. R. § 1926.652(b).[2] The Secretary of Labor's proposed sanction of $7,500.00 for this violation was reduced to $5,000.00, and penalties were assessed for other violations of standards which are not of particular relevance at this juncture.

The Occupational Safety and Health Review Commission[3] exercised its dis-

---

1. *See* 29 C.F.R. 1926.652(b), Table P–1.

2. "Sides of trenches in unstable or soft material, 5 feet or more in depth, shall be shored, sheeted, braced, sloped or otherwise supported . . ." (1973). The effective regulation in 1972 required those precautions for trenches four feet or more in depth.

3. The Review Commission is composed of three members appointed by the President for 6 year terms. The Commission is independent of the Secretary of Labor. It is authorized to appoint hearing examiners (now called administrative law judges) whose deci-

sions it is authorized to review on a discretionary basis. 29 U.S.C. § 661 (1970). The Commission was established to counter congressional complaints that earlier versions of the Occupational Safety and Health Act would have made the Secretary of Labor, in effect, prosecutor, judge, and jury in violation cases.

The Commission's function was designed to be adjudicative, and formulation of standards, together with the prosecution role, was assigned to the Secretary.

In this case, one of the Commissioners, *sua sponte*, proposed that consideration be given

cretion to review the case, and the findings were affirmed. One of the three members dissented on the ground that the hearing officer had misinterpreted and misapplied the term "willful."

The petitioner has chosen to attack the constitutionality of the Act on a variety of bases, asserting that the enforcement procedures involve an unlawful delegation of power to the executive branch and that the penalties, though denominated civil, are in fact criminal in nature. Some of the procedures to which the petitioner objects, that is, the power of the Commission to increase a proposed penalty, the vagueness of the general duty section, an employer's Sixth Amendment right to be confronted with his accusers, and the imposition of penalties pending determination of an appeal, are not involved in this case, and consequently, we will not decide them.

As provided by the Act, the OSHA inspector who visited the scene of the fatality issued citations against the Irey Company for a number of violations which he found. Included with each was a suggested penalty which would have been binding on the company had it not advised OSHA of its intent to contest the citations.[4] After Irey filed its notice of contest, the case was assigned to a hearing officer of the Review Commission who conducted the hearing at which both the Secretary and the employer presented evidence.

We need not recapitulate the Act in detail here.[5] Basically, it authorizes the Secretary of Labor to establish standards for safe working conditions at places of employment throughout the United States. OSHA inspectors are authorized to visit job sites and issue citations for violations of specific standards or the broad "general duty" clause.[6]

Violations fall into four categories:

1. *De minimis*, where no monetary penalty is invoked;

2. Non-serious, where penalties of up to $1,000.00 may be assessed;

3. Serious violations, defined as those which create a substantial probability of death or serious physical harm, where a mandatory penalty of up to $1,000.00 is provided; and

4. Willful or repeated violations, where a civil penalty of up to $10,000.00 may be assessed. The term "willful" is not defined by the statute.

Suits for recovery of the penalties may be brought in the district court, but there is no provision for review of the fact of violation or amount of penalty in that forum.[7] Criminal liability can be

to raising the Secretary's proposed penalty of $7,500.00 to $10,000.00. We suggest that by claiming such power the Commission invites criticism of its impartiality or at least its appearances. The Commission's assertion of a policy role was treated with disfavor in Madden v. Hodgson, 502 F.2d 278 (9th Cir. 1974). *Cf. Brennan v. Occupational Safety and Health Review Commission*, 492 F.2d 1027 (2d Cir. 1974).

4. 29 U.S.C. §§ 658(a), 659(a), 659(c) (1970).

5. *See* the general review of the Act and its purposes in *Brennan v. Occupational Safety and Health Review Commission*, 487 F.2d 438 (8th Cir. 1973), and *Brennan v. Occupational Safety and Health Review Commission*, 491 F.2d 1340 (2d Cir. 1974).

6. 29 U.S.C. § 654 (1970):
"(a) Each employer—

(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

(2) shall comply with occupational safety and health standards promulgated under this chapter."

7. In the House debate, it was stated that this provision should be narrowly construed and was intended to be limited to any process which might be necessary to actually collect the penalty. 116 Cong.Rec. 42207 (1970). Contrast this procedure with the one provided by the Coal Mines Health and Safety Act, 30 U.S.C. § 819(a)(3) (1969), where findings of fact are required before a penalty is assessed and where an employer is entitled to a limited *de novo* hearing in the district court. *See also* 2 Recommenda-

invoked in a situation where there is a willful violation which causes death to an employee. Imprisonment for six months and/or a fine of $10,000.00 may be imposed in such an event. Since no mention is made of the forum in which such a proceeding is to be conducted, it may be assumed that it is in the district court.

Petitioner emphasizes that as to a corporation, the criminal punishment of a fine of $10,000.00 is precisely the same as the civil penalty for a "willful" violation without the constitutional protections afforded a criminal defendant. Thus, the argument goes that the employer is deprived of rights guaranteed by the Fourth, Fifth, Sixth and Seventh Amendments and is not allowed an appeal to the courts on factual issues.

There is force and logic to these arguments, and we do not dismiss them lightly. Fatal to the petitioner's view, however, is a series of Supreme Court decisions which have validated the position that Congress has a wide range of alternatives available to it for enforcing its legislative policy through administrative agencies. Thus, in *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 947 (1938), it was held that monetary sanctions may be imposed administratively without invoking the judicial power, despite the contention that such penalties are essentially criminal in nature. The Court there also held that the

same conduct may subject a person to both civil and criminal sanctions, if the civil aspects are considered remedial.[8]

In the case *sub judice*, candor compels us to concede that the punitive aspects of the OSHA penalties, particularly for a "willful" violation, are far more apparent than any "remedial" features. However, a deliberate and conscious refusal to abate a hazardous condition may bring about a situation where a heavy civil penalty might be needed to effect compliance with safety standards. In any event, we have now come too far down the road to hold that a civil penalty may not be assessed to enforce observance of legislative policy. *See*, for example, *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1909), and *Hepner v. United States*, 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909). Although the label attached by Congress does not preclude judicial review of a statute which transgresses a constitutional right, no such infraction has occurred here.[9] *American Smelting & Refining Co. v. Occupational Safety and Health Review Commission*, 501 F.2d 504 (8th Cir. 1974).

Much of the petitioner's opposition is centered on the fact that the civil penalties are imposed, not through normal judicial processes but by administrative action—that is, by the executive branch with very narrow judicial review.[10]

tions and Reports of the Administrative Conference of the United States 67, 896 (1970–72), Appendix to the report of Professor Harvey J. Goldschmid compiling the statutes which provide for the use of civil penalties by federal agencies.

8. *Cf. United States v. U. S. Coin and Currency*, 401 U.S. 715, 718, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), where the Court observed there that "From the relevant constitutional standpoint there is no difference between a man who 'forfeits' $8,674 because he has used the money in illegal gambling activities and a man who pays a 'criminal fine' of $8,674, as a result of the same course of conduct. In both instances, money liability is predicated upon a finding of the owner's wrongful conduct; in both cases, the Fifth Amendment applies with equal force . . . ." In *Astol Calero-Toledo v. Pearson*

*Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), however, a Puerto Rican forfeiture statute, which sufficiently furthered punitive and deterrent purposes, was upheld against a constitutional challenge.

9. In *United States v. J. B. Williams, Inc.*, 498 F.2d 414 (2d Cir. 1974), Judge Friendly said, "[w]hile Congress could not permissibly undermine constitutional protections simply by appending the 'civil' label to traditionally criminal provisions, the *statute* here at issue is plainly not of that class." 498 F.2d at 421. That case involved the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. under which defendants were assessed civil penalties of $500,000.00.

10. This objection was forcefully expressed by a number of witnesses and statements dur-

It may be that Congress, by giving broad enforcement roles to OSHA and granting it the power to assess heavy penalties while at the same time limiting the scope of judicial review, has come close to the line which separates executive and judicial powers. However, we do not think that the line has been crossed. The legislation is still in the area where congressional discretion may be exercised, and the question is one of the wisdom of a course of action —not its constitutionality. In that context, of course, we must defer to the legislative judgment.[11]

In *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), the Court considered the question of the criteria to be applied in determining whether sanctions are penal or regulatory in nature. The Court said that in the absence of an expression of congressional intent such factors as *scienter*, punishment, and excessiveness, *inter alia*, may be weighed. We do not perform any such analysis here because the congressional intent is clear.[12]

Irey also objects to the procedures permitting the Secretary to propose a penalty which becomes final unless contested by the employer.[13] According to the petitioner, this placed an undue and illegal burden on him. We find no merit to this contention. The

---

ing the hearings of the House Select Subcommittee on Labor, Occupational Safety and Health Act of 1970 (Oversight and Proposed Amendments) (92nd Cong. 2nd Sess., 1973).

11. The dissent focuses on another disturbing element of this case—the denial of a jury trial under the Seventh Amendment. The majority, too, has serious misgivings as to the wisdom of limiting *de novo* review but does not agree with the dissent's conclusion of unconstitutionality. We do not think that the differences between *in rem* and *in personam* actions are sufficient to distinguish the thrust of such precedents as *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1909). In that case the Court refused to accept the proposition that Congress could not authorize the imposition of a penalty and commit its collection to an administrative office without the necessity of resorting to the judicial power. This view was tempered somewhat by *Lloyd Sabaudo Societa v. Elting*, 287 U.S. 329, 53 S.Ct. 167, 77 L.Ed. 341 (1932), which interpreted the statute to require a fair hearing and determination by the administrative officer upon facts produced in evidence. *See also* Gellhorn, Administrative Prescription and Imposition of Penalties, Wash.U.L.Q. 265 (1970); James, Right to a Jury Trial in Civil Actions, 72 Yale L.J. 655 (1963).

However, we do share Judge Gibbons' reservations about the extremely limited scope of judicial review and the absence of opportunity to a *de novo* trial on the merits. While the prospect of burdening the court with large numbers of appeals is a matter of concern from the standpoint of efficient judicial administration, we think experience demonstrates rather conclusively that in cas-

es of this nature *de novo* review is seldom requested. It is the availability of the remedy, not its infrequent utilization, which is important to the cause of justice. The mere existence of a local fire department is a source of satisfaction to a citizen, even though he would hope that he would never be forced to seek its assistance.

We perceive no overriding consideration which favors the congressional policy of recent years to insulate administrative adjudication from the open and searching examination that full judicial review provides. The necessity for an administrative agency on occasion to submit its determination to the scrutiny of a jury of citizens would be a healthful and disciplining experience.

The statutory court in *Lance Roofing Co. v. Hodgson*, 343 F.Supp. 685 (N.D.Ga.), aff'd 409 U.S. 1070, 93 S.Ct. 679, 34 L.Ed.2d 659 (1972), also expressed concern about judicial review, particularly as to penalties which may be assessed for failure to abate alleged continuing violations.

12. *But see* Hay, OSHA Penalties: Some Constitutional Considerations, 10 Idaho L.Rev. 223 (1974), where a *Mendoza-Martinez* analysis was performed. We note also the comments of Senator Dominick on civil penalties: ". . . We did it this way because I think most of us know how difficult it is to get an enforceable criminal penalty in these type of cases. Over and over again, the burden of proof under a criminal-type allegation is so strong that you simply cannot get there, so you might as well have a civil penalty instead of the criminal penalty and get the employer by the pocketbook if you cannot get him anywhere else." 116 Cong.Rec. 37338 (1970).

13. 29 U.S.C. § 659 (1970).

procedures are expressly authorized by the statute and are an acceptable way to commence an administrative proceeding. From a practical standpoint, the burden on the employer to respond is little different than that which requires a party to answer a complaint within a given time on penalty of a default judgment for a fixed sum. *Cf. Morton v. Delta Mining, Inc.*, 495 F.2d 38 (3d Cir. 1974).

The self-executing aspect of the Act is not violative of due process because an employer is given adequate opportunity for a hearing at a time when deprivation can still be averted. An employer who chooses not to file a timely contest is deemed to have waived his right to a hearing. The citation adequately apprises him of his right to contest and of the manner in which it is to be done; subsequent silence, therefore, is properly viewed as a knowing and intelligent waiver.

The discretion granted to the Commission to assess penalties is conditioned upon consideration of four factors:

1. Size of the employer;
2. Gravity of the violation;
3. Good faith; and
4. Previous history.[14]

We find the action of the administrative agency in applying those standards to these ·facts to be reasonable and within the scope of statutory authority.

14. 29 U.S.C. § 666(i) (1970). *But see Madden v. Hodgson, supra.*

15. The statement of Chief Judge Bazelon in *Wellford v. Ruckelshaus*, 142 U.S.App.D.C. 88, 439 F.2d 598, 603 (1971), is apt. In remanding for reconsideration, he said, "this course is especially appropriate in view of the fact that we are venturing into a new and uncharted area of the law. A new public sensitivity to issues of environmental protection has imposed new responsibilities on the courts, the legislature, and the administrative agencies. A new Environmental Protection Agency has been established, and its Administrator has the critical task of developing standards for administrative action throughout this area . . . ."

16. The examiner found that the bottom of the trench was at elevation 1054. Test boring report No. 107 shows shale beginning at

■ When the delegation of legislative authority to an administrative agency is broad in scope, the courts have a greater role to play to prevent or correct disparate treatment of those subjected to regulation. Furthermore, it is the duty of the courts to interpret the statute under which the agency functions and to determine whether the agency is acting within the congressional purpose. *See* Wright, Beyond Discretionary Justice, 81 Yale L.J. 575 (1972).

It is in this spirit that we approach the issue raised by the dissenting member of the Commission on the proper interpretation of the term "willful." [15]

The hearing officer concluded that a willful violation may exist under the Act when the employer commits an intentional and knowing violation and is conscious that his action is proscribed or, if the employer is not consciously violating the Act, when he is aware that a hazardous condition exists and makes no reasonable effort to eliminate the condition.

The hearing officer found that the failure to shore the trench was a willful violation of the Act even though the superintendent "either misconstrued or misunderstood" the test boring data.[16] He summarized by saying, "Respondent [Irey], in effect, admits that he did not ascertain beforehand the true nature of the soil which it was excavating, or that

elevation 1053.5 or 6 inches below the bottom of the trench, and the hearing officer concluded that the bottom of the trench was 6 inches above the level of the shale seam. However, he failed to note that the test boring was some 30 feet from the scene of the fatality. Another test boring, No. 105, approximately 45 feet from the accident scene showed the shale at elevation 1058.3, indicating that the level was rising from the point at test boring No. 107 to where the accident occurred. Furthermore, the soil expert, whose testimony was not contradicted, pointed out that the reports indicated that the rock levels were higher than the hearing officer found them to be. We make this point not to reverse the examiner's findings of fact but to point out that the difference in interpretation of the technical data weakens any inference that conscious wrongdoing was involved.

it failed to either comprehend from the information it had what was the true composition of the material it was excavating." The decision concluded that the knowledge of the citation issued by the state in November of 1971 and the failure to acquaint itself with "the full facts" constituted a willful violation by the employer.

The Act defines a "serious" violation as one which requires proof of a substantial probability that death or serious harm could result from a condition, "unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation."[17] To rephrase, a finding of a "serious" violation requires that the condition was hazardous and that the employer knew or should have known of it—precisely the alternative definition of "willful" which the hearing officer adopted.

■ It is obvious from the size of the penalty which can be imposed for a "willful" infraction—ten times that of a "serious" one—that Congress meant to deal with a more flagrant type of conduct than that of a "serious" violation. Willfulness connotes defiance or such reckless disregard of consequences as to be equivalent to a knowing, conscious, and deliberate flaunting of the Act. Willful means more than merely voluntary action or omission—it involves an element of obstinate refusal to comply.

The meaning of willfulness changes with the context in which it appears. Thus, willfulness in a tax case, *e. g., United States v. Bishop,* 412 U.S. 346, 360, 93 S.Ct. 2008, 36 L.Ed.2d 941, (1973), varies from the definition in a suit for a penalty for failing to unload cattle, *e. g., United States v. Illinois Central Railroad,* 303 U.S. 239, 242, 58 S.Ct. 533, 82 L.Ed. 773 (1938).

We believe that a restrictive definition is appropriate here since otherwise there would be no distinction between a "serious" offense and a "willful" one. The lack of demarcation would permit

the agency to assess a higher penalty than that which is authorized for conduct defined as a "serious" violation. A broad interpretation of "willful" would disrupt the gradations of penalties and violations so carefully provided in the Act.

■■ The government has the burden of establishing that an offense was willful,[18] and this court has the power to determine whether that burden has been met. *National Realty v. Occupational Safety and Health Review Commission,* 489 F.2d 1257 (D.C.Cir.1973). However, since the Commission here based its judgment on an erroneous legal standard, we think it appropriate to remand for further consideration.

We have reviewed the record applicable to the other violations assessed against the petitioner and find no error.

The Commission's decision finding a willful violation of 29 C.F.R. 192.652(b) is vacated and remanded for further consideration not inconsistent with this opinion. The order assessing penalties for violations of §§ 1926.652(h), 1926.-401(f), 1926.150(c)(1)(viii), 1926.350 (a)(1), 1926.51(c), and 1926.51(a)(1) will be affirmed.

GIBBONS, Circuit Judge (dissenting):

Although I agree with most of what the majority opinion says, I dissent from the judgment enforcing the administrative civil penalty on the single and narrow ground that the administrative civil penalty device violates the seventh amendment. As Judge Weis' opinion makes clear, suits for recovery of the penalties assessed by the administrative agency may be brought in the district court, Pub.L. No. 91–596, § 17, 29 U.S.C. § 666(k), but the only judicial review afforded with respect to the fact of violation or the amount of the penalty is in this court. Pub.L. No. 91–956, § 11(a), 29 U.S.C. § 660(a). Although the language of 29 U.S.C. § 666(k) is far from

17. 29 U.S.C. § 666(j).

18. 29 C.F.R. § 2200.73(a) (1973).

clear, the legislative history referred to in footnote 7 of the majority opinion suggests that the role of the district court is to do nothing other than issue execution on what is essentially an administrative in personam money judgment.

The central feature of the compromise which produced the Constitution of 1787 was the empowerment of the national government to act directly upon persons rather than, as under the Articles of Confederation, on member States. The extent of the transfer of sovereignty to act upon citizens directly was set forth in Article III. One express limitation upon the central government's power is the provision in Article III, § 2 that the trial of all crimes shall be by jury. When the Constitution was presented to the ratifying conventions the people, fearful of the aggrandizement of power in the national government, insisted on further limitations which were in 1791 incorporated in the Bill of Rights. One of those limitations is the seventh amendment, which guarantees jury trials in civil actions at law. A suit for the recovery of an in personam money judgment is certainly an action at law.

If the civil penalty provisions of the Occupational Safety and Health Act were to be construed as penal, the jury trial provision of Article III, § 2 would apply, as would the double jeopardy clause of the fifth amendment. The respondent so contends, but I agree with the majority that it is now well settled that Congress can, in enforcing federal policies, choose civil or penal remedies, alternatively or concurrently, at least within the limits suggested in cases such as *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). I agree as well, although with considerable misgivings, that the civil penalty provisions in OSHA fall within the civil parameters delineated in the cases, and thus that the statute does not infringe the right to a jury trial guaranteed in Article III, § 2.

The civil jury trial guarantee of the seventh amendment is not so easily disposed of. The statute permits the determination of a civil penalty without jury trial, which can be reduced to an in personam money judgment and executed upon. If in 1791 an action for such a money judgment would have been an action at law, it follows that the action falls, today, within the amendment. *See Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447, 7 L.Ed. 732 (1830); *Fleitmann v. Welsbach Lighting Co.*, 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505 (1916). Not every legal proceeding whereby the government might recover money was in 1791 an action at law. The same First Congress which recommended the ratification of the seventh amendment recognized as much when it enacted the Act of July 31, 1789, ch. 5, 1 Stat. 29, "An Act to regulate the Collection of the Duties imposed by law on the tonnage of ships or vessels, and on goods, wares and merchandises imported into the United States." That statute created ports of entry and designated collectors of customs,[1] imposed tonnage duties on vessels [2] and import duties on goods,[3] and provided that the exactions could be collected by detaining the vessels or the goods.[4] This has been the uninterrupted course of customs duties assessment in the United States ever since: in rem against the importing vessels.[5] Neither libels in admiralty nor customs valuation proceedings were in the Colonies, in England, or in the States prior to 1791 actions at law. The First Congress, which simultaneously considered both the text of the seventh amendment and

1. Act of July 31, 1789, ch. 5, § 1, 1 Stat. 29.

2. Act of July 20, 1789, ch. 3, 1 Stat. 27.

3. Act of July 4, 1789, ch. 2, 1 Stat. 24.

4. Act of July 31, 1789, ch. 5, § 12, 1 Stat. 39.

5. The statute also provided for civil penalties recoverable in an action at law, Act of July 31, 1789, ch. 5, § 12, 1 Stat. 39, § 36, 1 Stat. 47.

the first customs act was well aware of the distinction. There is no indication that it believed an in personam judgment for more than $20.00 could after ratification of the proposed bill of rights be recovered by the government without a jury trial. The customs law was revised extensively by the Act of March 2, 1799, ch. 22, 1 Stat. 627. That act imposed not only in rem penalties against the vessel, but civil and criminal penalties against the master. It was still in effect, with certain amendments, when in 1870 the case of *United States v. The Queen,* 27 Fed.Cas. 669 (No. 16,107) (S.D.N.Y.1870) came before then district judge, later Justice, Blatchford. That case started when the United States Attorney filed an information against both the master and the vessel for breach of certain duties imposed by the customs laws, seeking forfeitures in excess of twenty dollars. The case against both was tried before the district court, which held that it had admiralty jurisdiction to enforce the penalty against the vessel in rem. Judge Blatchford went on to hold:

> "The remaining questions are, as to whether there can be a joint suit against the vessel and the master, and as to whether the master is entitled to a trial by jury, and as to whether this suit, if not maintainable as to both vessel and master, can be dismissed as to the master, and yet a decree be rendered in it against the vessel.

> As regards the enforcement of the penalty against the master, he is entitled to a trial by jury. The seventh amendment to the constitution of the United States provides, that, in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved. The expression 'suits at common law,' as there used, means all civil suits, in which legal rights are to be ascertained and determined, which are not of equity or admiralty jurisdiction, whatever may be the peculiar forms of such suits. *Parsons v. Bed-*

*ford,* 3 Pet. [28 U.S.] 433, 447, 7 L.Ed. 732. The ninth section of the judiciary act of September 24, 1789 (1 Stat. 76, 77), declares, that the trial of issues of fact, in the district courts, in all causes except civil causes of admiralty and maritime jurisdiction, shall be by jury. The suit against the master, under the statute in question, for the penalty imposed, is not made by statute cognizable in admiralty, nor is there any provision that the penalty may be recovered against the master summarily, by libel, as there is in respect to the vessel." 27 Fed.Cas. at 671.

Judge Blatchford dismissed the case against the master but sustained the libel against the vessel, rejecting the contention that because of the misjoinder the libel should fall. The latter contention was raised by the owner on appeal to the old Circuit Court, which held that it was proper to discharge the master on the claim that he was entitled to a trial by jury, and that his misjoinder did not affect the in rem proceeding against the vessel. *United States v. The Queen,* 27 Fed.Cas. 672 (No. 16,108) (C.C.S.D. N.Y.1873). I have found no earlier instance in which any attempt was made to proceed civilly in personam against a master under the customs laws in a summary proceeding. All of the subsequent civil penalties cases under the customs laws are in rem proceedings. A case demonstrating the essentially in rem nature of proceedings under the customs laws, though not involving a civil penalty, but a disputed assessment of duty, also written by Justice Blatchford, is *In re Fassett,* 142 U.S. 479, 12 S.Ct. 295, 35 L.Ed. 1087 (1892). Others include *Passavant v. United States,* 148 U.S. 214, 13 S.Ct. 572, 37 L.Ed. 426 (1893) and *Origet v. Hedden,* 155 U.S. 228, 15 S.Ct. 92, 39 L.Ed. 130 (1894). I have found no case arising under the customs laws which sustained an administrative civil penalty exacted in personam rather than in rem.

The first attempt by Congress to deal with the business of importing people

(aside from measures for the suppression of the slave trade) was the Act of March 2, 1819, ch. 46, 3 Stat. 488. Concerned over inhumane treatment of immigrant passengers, Congress determined to enact limitations upon the number of passengers a vessel could safely carry. It forbade vessels landing at United States ports from carrying more than two passengers for every five tons of vessel according to customs house measurement. For an enforcement mechanism it turned to the example of the earlier customs laws, enacting in personam civil penalties and in rem forfeitures. Section 1 provided that the owner would be liable to forfeit to the United States $150.00 for each excess passenger "to be recovered by suit, in any circuit or district court of the United States, where the said vessel may arrive, or where the owner or owners aforesaid may reside . . . ." Quite obviously the forfeiture could be collected by a libel against the vessel in the district court, as to which there would be no jury trial, or by an in personam action in the old circuit court where the owner resided, as to which there was a right to a jury trial.[6] The Act of February 22, 1847, ch. 16, § 1, 9 Stat. 127 added criminal provisions, and a major revision of the Act of March 3, 1855, ch. 213, 10 Stat. 715, in § 19 saved the earlier penalty provisions from repeal. 10 Stat. 721. These passenger vessel safety laws provided the models for an enforcement mechanism when Congress, in 1882, first passed a comprehensive immigration law. Act of Aug. 3, 1882, ch. 376, 22 Stat. 214.[7] That Act imposed a head tax of fifty cents an immigrant passenger, and provided:

"The duty imposed by this section shall be a lien upon the vessels which shall bring such passengers into the United States, and shall be a debt in favor of the United States against the owner or owners of such vessels; and the payment of such duty may be enforced by any legal or equitable remedy." § 1, 22 Stat. 214.

The immigration laws went through a general recodification in the Act of March 3, 1891, ch. 551, 26 Stat. 1084 and a general revision in the Act of March 3, 1903, ch. 1012, 32 Stat. 1213. Although there were criminal and civil judicial remedies in these statutes, the basic enforcement mechanism continued to be the imposition of duties upon owners and masters of vessels, enforceable by detaining the vessel. These proceedings were clearly in rem. Such an enforcement mechanism was challenged in *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1909) on the ground that it was penal. Justice White for the Court rejected that contention, and his opinion is frequently cited as authority for an extensive discretion in the Congress to choose civil rather than penal means. The case does not speak to the seventh amendment, however, because although the penalties were challenged in a suit for a refund, they had been exacted by detaining the vessel and paid to obtain its release. The proceeding was in rem. Similar enforcement devices were continued in the Quota Act of 1921, Act of May 19, 1921, ch. 8, 42 Stat. 5, as amended, and the Immigration Law of 1917, Act of February 5, 1917, ch. 29, 39 Stat. 874, as amended. These were challenged in *Elting v. North German Lloyd*, 287 U.S. 324, 53 S.Ct. 164, 77 L.Ed. 337 (1932) and *Lloyd Sabaudo Societa v. Elting*, 287 U.S. 329, 53 S.Ct. 167, 77 L.Ed. 341 (1932). The due process contention was once more rejected, but as in *Oceanic Navigation Co. v. Stranahan, supra,* no seventh amendment issue was presented since the exac-

---

6. Section 2 provided for total in rem forfeiture of the vessel for overloading by more than twenty passengers. Section 3 created a private cause of action for passengers suffering from short allowances "to be re- covered in the same manner as seaman's wages are, or may be, recovered."

7. See an earlier limited immigration law, Act of March 3, 1875, ch. 141, 18 Stat. 477.

tions had been paid in order to obtain clearance of the vessel. *See also Osaka Shosen Kaisha Line v. United States*, 300 U.S. 98, 57 S.Ct. 356, 81 L.Ed. 532 (1937). I have found no case arising under either the passenger safety laws or the immigration laws sustaining an administrative civil penalty exacted in personam rather than in rem.

One other line of cases which must be considered is that commencing with *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855). That case, too, arose out of the collection of import duties. The same Act of July 31, 1789 which created the method for collecting customs duties had provided in § 9:

> "That . . . the collectors of the different ports shall at all times pay to the order of the officer who shall be authorized to direct the same, the whole of the monies which they may respectively receive by virtue of this act (such monies as they are otherwise by this act directed to pay, only excepted), and shall also, once in every three months, or oftener if they shall be required, transmit their accounts for settlement to the department or officer before mentioned." 1 Stat. 38.

The collectors thus were fiduciaries collecting monies on behalf of the Treasury of the United States and under a duty to account as such. In 1820 Congress enacted "An Act providing for the better organization of the Treasury Department", Act of May 15, 1820, ch. 107, 3 Stat. 592, which designated specific officers in the Treasury Department for the enforcement of the fiduciary obligations of federal fiscal officers. The statute provided in § 2:

> "That . . . if any collector of the revenue . . . who shall have received the public money before it is paid into the treasury of the United States, shall fail to render his account, or pay over the same in the manner, or within the time required by law, it shall be the duty of the first comptrol-

ler of the treasury to cause to be stated the account of such collector . . . exhibiting truly the amount due to the United States, and certifying the same to the agent of the treasury, who is hereby authorized to issue a warrant of distress against such delinquent officer . . . ." 3 Stat. 592.

The same section authorized the execution of such a distress warrant on personal property of the delinquent officer or his sureties. It also provided:

> "And the amount due by any such officer . . . shall be . . . a lien upon the lands, tenements, and hereditaments of such officer and his sureties, from the date of a levy in pursuance of the warrant of distress issued against him or them, and a record thereof, made in the office of the clerk of the district court of the proper district, until the same shall be discharged according to law." 3 Stat. 593.

Section 4 of the 1820 Act provided that any person aggrieved by a distress warrant could sue in the United States district court for an injunction to stay execution, but no injunction could issue unless the complaining party gave bond with sufficient surety to pay any judgment which might result against him, and no injunction would impair the lien imposed by Section 2. 3 Stat. 595.

The famous Samuel Swartwout became collector of the Port of New York in 1830. When his account was audited in 1838 he was short $1,374,119.65, and a distress warrant was issued in that amount. Swartwout owned real estate in New Jersey, and the lien of the distress warrant was prior in time to an execution on a judgment in favor of another creditor. Purchasers at the judgment execution sale brought an action in ejectment against purchasers at the warrant execution sale, contending that the Act of May 15, 1820 was unconstitutional for a host of reasons, including a claimed seventh amendment violation and thus that their title was superior.

The opinion of Justice Curtis in *Murray's Lessee, supra,* is often cited in support of a broad authority in Congress to resort to summary remedies for the collection of debts claimed to be due the United States. More refined analysis than is sometimes made, however, leads me to conclude that it is no authority for the proposition that there is no right to a jury trial when the United States seeks to recover an in personam money judgment. In the first place, although the plaintiffs urged the seventh amendment [8] Justice Curtis does not discuss it. Possibly this silence reflects a conclusion that remote successors to Swartwout's title lacked standing to assert his right to a jury trial rather than to the provision for equitable relief set forth in Section 4. But more likely Justice Curtis did not take the seventh amendment claim seriously, because Swartwout was a fiduciary under a duty to account. The enforcement of the duty of a fiduciary to account is a matter of equitable jurisdiction. *See* 4 Pomeroy's Equity Jurisprudence § 1075–80, at 217–31 (5th ed. 1941). Secondly, the case involved an in rem proceeding. The lien of the United States, under foreclosure of which the successful defendant held title, had not resulted from the execution of an in personam judgment against Swartwout. Thus the case, for seventh amendment purposes, is indistinguishable from those arising under the customs, immigration, and vessel safety laws. The statute sustained in *Murray's Lessee v. Hoboken Land and Improvement Co., supra* has served as the model not only for those statutes securing the federal fisc from defaulting fiduciaries, but also for those securing the internal revenue. *See* Act of July 13, 1866, ch. 184, § 9, 14 Stat. 107, now codified in the Internal Revenue Act, 26 U.S.C. § 6321. These in rem lien statutes do not present a seventh amendment problem.

We come, then, to the case upon which the government places its chief reliance. In *Helvering v. Mitchell,* 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938), the Supreme Court sustained the 50% civil fraud penalty provisions of the Revenue Act of 1928, ch. 852, § 293, 45 Stat. 791. The case arose on certiorari to the Second Circuit which had reviewed a decision of the Board of Tax Appeals. The chief attack upon the statute was that it was penal. Justice Brandeis rejected this contention. In the course of his discussion he wrote:

"Thus the determination of the facts upon which liability is based may be by an administrative agency instead of a jury,[7] . . .

7. *Passavant v. United States,* 148 U.S. 214, 13 S.Ct. 572, 37 L.Ed. 426; *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013; *Elting v. North German Lloyd,* 287 U.S. 324, 327–328, 53 S.Ct. 164, 77 L.Ed. 337; *Lloyd Sabaudo Societa v. Elting,* 287 U.S. 329, 334, 53 S.Ct. 167, 77 L.Ed. 341; cf. *Hamburg-American Line v. United States,* 291 U.S. 420, 54 S.Ct. 491, 78 L. Ed. 887; *Osaka Shosen Kaisha Line v. United States,* 300 U.S. 98, 57 S.Ct. 356, 81 L.Ed. 532. Compare also *San Souci v. Compagnie Francaise de Navigation A Vapeur,* 71 F.2d 651, 653 (C.C.A. 1); *Lloyd Royal Belge, S.A. v. Elting,* 61 F.2d 745, 747 (C.C.A. 2); *Navigazione Libera Triestina v. United States,* 36 F.2d 631, 633 (C.C.A. 9); *Clay v. Swope,* 38 F. 396 (C.C. D.Ky.). And see cases cited in note 2, *supra.*

Administrative determination of sanctions imposed by the income tax laws has likewise been upheld. *Berlin v. Commissioner,* 59 F.2d 996, 997 (C.C.A. 2); *McDowell v. Heiner,* 9 F.2d 120 (W.D.Pa.), aff'd on opinion below, 15 F.2d 1015 (C. C.A.3); *Board v. Commissioner,* 51 F.2d 73, 76 (C.C.A. 6); *Wickham v. Commissioner,* 65 F.2d 527, 531–532 (C.C.A. 8); *Little v. Helvering,* 75 F.2d 436, 439 (C. C.A. 8); *Bothwell v. Commissioner,* 77 F.2d 35, 38 (C.C.A. 10); *Doll v. Evans,* Fed.Cas. No. 3,969 (C.C.E.D.Pa.)." 303 U.S. at 402–403, 58 S.Ct. at 635.

The government urges this statement as dispositive of the jury trial contention, but it is abundantly clear that Justice Brandeis' reference to jury trial is to the guarantee of jury trial in Article III, § 2, and not to the seventh amendment. It is abundantly clear, first in the context of

8. See 59 U.S. (18 How.) at 273.

the entire sentence, which goes on to contrast civil versus criminal procedure. It is clear, as well, in the context of the prior sentence, contrasting those constitutional guarantees applicable to criminal prosecutions. Moreover no seventh amendment issue was presented, since the taxpayer had elected to pursue the administrative remedy before the Board of Tax Appeals rather than to pay the tax and sue for a refund in the district court, where he could have had a jury trial. *See* Int.Rev.Code of 1954, § 7422, 26 U.S.C. § 7422; 28 U.S.C. § 1346 and notes. Finally, and most significantly, Justice Brandeis shows a complete awareness of the essentially in rem nature of the tax collection machinery. *See* especially 303 U.S. at 400, 58 S.Ct. 630. Indeed every case listed in footnote 7 to the opinion in *Helvering v. Mitchell* involves a penalty or forfeiture assessed in rem rather than in personam. His principal references I have discussed hereinabove. His reference to jury trial in *Helvering v. Mitchell* is not a reference to jury trial in actions at law guaranteed by the seventh amendment. It is a reference solely to the guarantee in Article III, § 2.

One other case bears mention. In *N. L. R. B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), the Supreme Court directed the enforcement of a Board order in an unfair labor practice case which required reinstatement and back pay. It was contended that the award of back pay was the equivalent of a money judgment and was in contravention of the seventh amendment. Chief Justice Hughes wrote:

"The Seventh Amendment provides that 'In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.' The amendment thus preserves the right which existed under the common law when the amendment was adopted. . . . Thus it has no application to cases where recovery of money damages is an incident to equitable relief even though damages might have been recovered in an action at law. . . . It does not apply where the proceeding is not in the nature of a suit at common law." 301 U.S. at 48, 57 S. Ct. at 629 (citations omitted).

Since the essence of the NLRB enforcement proceeding was injunctive relief directed at the cessation of unfair practices, the proceeding was essentially equitable, and incidental money relief could be awarded without a jury trial. But in the case before us, the only relief sought was the recovery of an in personam money judgment. The civil penalty provisions of OSHA cannot be sustained on the ground that they are incident to the grant of equitable relief.

Summarizing, then, no case in the Supreme Court has ever sustained the imposition of an in personam judgment for a civil penalty in a proceeding in which the defendant claimed and was denied the right of jury trial guaranteed by the seventh amendment. Each case on which the government relies involved the rejection of a penal contention, and hence of a different jury trial guarantee, or involved a proceeding in equity or admiralty, or involved a proceeding in rem. *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), holding that the seventh amendment applies in stockholder derivative suits, though not directly in point, certainly suggests the result which I would reach.[9] I am unenthusiastic about narrowing the specific guarantees of the Bill of Rights. In the absence of a case in point in the Supreme Court, I prefer to assume that

9. Justice Holmes, in *Fleitmann v. Welsbach Co.,* 240 U.S. 27, 29, 36 S.Ct. 233, 234, 60 L.Ed. 505 (1916), noted

"when a penalty of triple damages is sought to be inflicted, the statute should not be read as attempting to authorize liability to be enforced otherwise than through the verdict of a jury in a court of common law."

the seventh amendment still has meaning.

Nor, does it seem, that compliance with the seventh amendment would seriously frustrate the congressional policy of entrusting primary enforcement authority to an administrative agency. Until recently [10] Congress commonly provided for civil penalties which could be proposed by an agency but recovered in a civil suit in which the defendant obtained a trial de novo.[11] With respect to such statutes, Professor Jaffe referring particularly to 47 U.S.C. §§ 503 & 504 of the Federal Communications Act writes:

"Here it will be seen is a flexible penalty of substantial proportions. By the device of a notice of 'apparent liability', the commission is able to make a semi-formal though legally inconclusive adjudication. It will be seen that by failing to prosecute or by a process of remission and mitigation the Commission has considerable control over the amount of the penalty. To date, so far as I know, in not a single determination of apparent liability has the Government been put to a suit to recover." L. Jaffe, Judicial Control of Administrative Action 113 (Student ed. 1965).

Recognizing that there are differences, with respect to the degree of difficulty of the enforcement problem, between OSHA and some of the earlier models such as the Federal Communications Act, still I find it difficult to understand why, with such models in effect and apparently working, Congress has chosen in its more recent regulatory enactments to push so hard and so far in the direction of avoiding compliance with an express provision of the Bill of Rights. I would hold that the civil penalty provisions of OSHA which result in

10. A recent survey conducted for the Administrative Conference of the United States on the use of civil money penalties by federal administrative agencies indicated only three other agencies which claim the power to impose sanctions administratively subject to judicial review solely upon the "substantial evidence" test. 2 Recommendations and Reports of the Administrative Conference of the United States 948–52 (Appendix A) (1972).

These include: (1) the modern compilation of sanctions enforced by the Immigration and Naturalization Service collected in Title 8 of the United States Code whose historical antecedents have already been reviewed. The Report noted the three Supreme Court decisions which sustained the administratively imposed civil penalties. (As indicated previously—all in the context of in rem proceedings). *Lloyd Sabaudo Societa v. Elting*, 287 U.S. 329, 53 S.Ct. 167, 77 L.Ed. 341 (1932) ; *Elting v. North German Lloyd*, 287 U.S. 324, 53 S.Ct. 164, 77 L.Ed. 337 (1932) ; and *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1909). Conference Report at 952 n. 3. (2) The Federal Home Loan Bank Board which is given authority to enforce a number of civil money penalty provisions in Title 12. *See, e. g.,* 12 U.S.C. §§ 1425a(d), 1425b(b). However, as the Conference Report noted, "[c]ounsel for the FHLBB reported that 'there has never been a court appeal' but that review would be limited to considering whether the Board has acted arbitrarily or capriciously." Conference Report at 952 n. 5. (3) The United States Postal Service which is authorized to impose civil money penalties on private contract carriers pursuant to 39 U.S.C. § 3603 and 49 U.S.C. § 1471. This authority was upheld in *Allman v. United States*, 131 U.S. 31, 35, 93 S.Ct. 632, 33 L.Ed. 51 (1889) ; *Great Northern Ry. v. United States*, 236 F. 433, 443–444 (8th Cir. 1916). *Allman* however, does not discuss any seventh amendment issue, undoubtedly because the postal contractor had by contract agreed to the administrative determination of a · penalty for non-performance. *See Great Northern Ry Co., supra,* at 439. Conference Report at 952 n. 6.

In addition to those statutes listed in the Administrative Conference survey, the Endangered Species Act of 1973, 16 U.S.C. § 1540(a) authorizes the Secretary of Interior to assess a variety of civil money penalties subject to judicial review under the "substantial evidence" standard. The provision has not been tested in the courts.

11. The survey conducted for the Administrative Conference, indicated that with the exception of those civil money penalties enumerated in note 10 *supra*, the remaining monetary sanctions were either administratively imposed, or administratively assessed and judicially imposed, by some 34 different executive departments and independent agencies subject always to de novo judicial review.

an in personam money judgment, but deprive the defendant of the jury trial guaranteed by the seventh amendment, are unconstitutional.[12]

Before: SEITZ, Chief Judge, STALEY, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

On Petition for Hearing In Banc

WEIS, Circuit Judge.

We revisit the important question of the right to a jury trial in an OSHA penalty proceeding. A majority of the panel which originally heard this case decided that the administrative proceedings did not run afoul of the Seventh Amendment. 519 F.2d 1200 (3d Cir., 1974). After further briefing and argument before the court *in banc,* we have concluded that the judgment of the panel should stand.

The factual background of the case is set out in the prior opinion, and we need not repeat it here. The employer-petitioner contends that the assessment of a civil penalty by the Occupational Safety and Health Review Commission was, for all intents and purposes, the same as an *in personam* monetary judgment. It argues that such a proceeding, being in the nature of debt, presents an issue which historically was tried at common law and, therefore, a jury trial should be available even though the government is the plaintiff. *Hepner v. United States,* 213 U.S. 103, 29 S.Ct. 474, 53 L. Ed. 720 (1909).

The requirement of a jury verdict could be met in a *de novo* trial in the district court on appeal from an administrative agency. However, the Occupational Safety and Health Act permits only limited judicial review of the administrative agency's factual findings under the "substantial evidence" test. It is that narrow scope of review which, according to petitioner, abrogated its Seventh Amendment right to a trial by jury, both as to the fact of violation and the amount of penalty.[1]

The Secretary asserts that OSHA proceedings are essentially equitable and for that reason the Amendment does not apply. He contends that the enforcement procedures are designed to insure compliance with safety standards and that the purpose of civil penalties is to prevent recurrences of violations.

Since the scope of review is important to the resolution of this appeal, a survey of the Act's provisions on judicial review is appropriate. A person against whom a penalty has been imposed may obtain a review of the order in the appropriate United States court of appeals. That court is authorized "to make and enter upon the pleadings, testimony, and proceedings set forth in such record a decree affirming, modifying, or setting aside in whole or in part, the order of the Commission and enforcing the same to the extent that such order is affirmed or modified. * * * The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." If further evidence is required, the court can order it to be taken before the Commission. 29 U.S.C. § 660(a).

---

12. In *Brennan v. Occupational Safety and Health Review Comm'n,* 502 F.2d 946 (3d Cir., 1974) the seventh amendment issue was not raised in connection with the administrative imposition of a civil penalty because the employer-respondent, while not withdrawing its contest of the Secretary's citation, filed no response to the Secretary's petition for review.

1. That substantial amounts may be involved is demonstrated by Beall Construction Co. v. Occupational Safety & H. Rev. Com'n, 507 F. 2d 1041 (8th Cir. 1974). There, OSHA had proposed penalties totalling $35,442 for alleged safety violations at a construction site. Through administrative proceedings before an administrative law judge and the Commission, the penalties were reduced to $620. The large penalties initially proposed understandably alarm employers in similar circumstances. On the other hand, the final outcome may be cited by those who maintain that the administrative remedies do serve to prevent some injustices.

The Secretary also has the right to petition the court for review. Alternatively, an OSHA order which has not been appealed by the employer may be filed by the Secretary with the clerk of the court of appeals, who will then enter a decree enforcing the order unless otherwise directed by the court. 29 U.S.C. § 660(b). The court of appeals may assess the civil penalties of 29 U.S.C. § 666(a)–(d) as well as any other available remedies in a contempt proceeding brought to enforce its decree. When, apparently, neither party has invoked the review jurisdiction of the court of appeals, civil penalties may be recovered in a civil action in the United States district court.[2] 29 U.S.C. § 666(k).

In summary, while court review of the fact of violation and amount of penalty is limited by the substantial-evidence standard, the agency may compel payment only by resort to the judicial system. The Act does not totally exclude the judicial branch of government from overseeing and enforcing the statutory provisions. *See National Labor Relations Board v. Kingston Cake Co.*, 206 F.2d 604, 611 (3d Cir. 1953). *See also* JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 264 (1965).

The application of the Seventh Amendment to judicial proceedings traditionally depended on whether the suit was legal or equitable in nature. *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446, 7 L.Ed. 732 (1830). If a statute creates a new remedy which is to be processed in the courts, that distinction is pertinent and may determine whether a jury trial is required. *Curtis v. Loether*, 415 U.S.

189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).[3]

But, if the proceeding is before an administrative agency rather than in the courts, the Supreme Court has held that the Seventh Amendment does not apply. In *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), an administrative award of back pay was challenged as violative of the Constitution. The Court said:

"It is argued that the requirement is equivalent to a money judgment and hence contravenes the Seventh Amendment with respect to trial by jury. The Seventh Amendment provides that 'In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.' The amendment thus preserves the right which existed under the common law when the amendment was adopted. [Citations] Thus it has no application to cases where recovery of money damages is an incident to equitable relief even though damages might have been recovered in an action at law. [Citations] It does not apply where the proceeding is not in the nature of a suit at common law. [Citation]

"The instant case is not a suit at common law or in the nature of such a suit. The *proceeding* is one unknown to the common law. It is a statutory *proceeding*. Reinstatement of the employee and payment for time lost are requirements imposed for violation of the statute and are remedies appropriate to its enforcement. The contention under the Seventh Amendment is without merit." 301

---

2. An employer who sought to litigate the fact of violation at that stage would be confronted with his failure to utilize the judicial review provided by the statute. *United States v. Sykes*, 310 F.2d 417 (5th Cir. 1962); *Weir v. United States*, 310 F.2d 149 (8th Cir. 1962). 3 Davis, Administrative Law Treatise § 23.07 (1958).

3. The issue to be submitted to the factfinder is the relevant focus of an inquiry rather than the general nature of the proceeding. After the issue has been defined, its historical setting is then determined to see whether it would have been tried "at common law" in contradistinction to equity. 9 Wright & Miller, Federal Practice and Procedure: Civil § 2302 (1971).

U.S. at 48–49, 57 S.Ct. at 629. (Emphasis added).[4]

The Court reiterated its position in Curtis v. Loether, *supra,* stating:

> *"Jones & Laughlin* merely stands for the proposition that the Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication and would substantially interfere with the NLRB's role in the statutory scheme . . . These cases uphold congressional power to entrust enforcement of statutory rights to an administrative process or specialized court of equity free from the strictures of the Seventh Amendment." 415 U.S. at 194–95, 94 S.Ct. at 108–109 (footnote omitted).

The same theme was repeated a few months later in *Pernell v. Southall Realty,* 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974), in the context of a statute governing landlord-tenant disputes. While holding that a jury trial was required because of the underlying legal nature of the suit in the District of Columbia courts, Mr. Justice Marshall wrote:

> "We may assume that the Seventh Amendment would not be a bar to a congressional effort to entrust landlord-tenant disputes, including those over the right to possession, to an administrative agency." 416 U.S. at 383, 94 S.Ct. at 1733.

This statement was based on the case of *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921).[5]

A fair reading of the Supreme Court's decisions on the application of the Seventh Amendment establishes three categories of litigation:

1. Legal proceedings in the courts;
2. Equitable and admiralty cases in the courts; and
3. Administrative adjudications.[6]

In only the first classification is the jury mandated.

---

4. It has been suggested that some administrative remedies have been held outside the Amendment's ambit because of "a strangeness to the common law" rather than "a correspondence to equity." Note, *The Seventh Amendment and Civil Rights Statutes: History Adrift in a Maelstrom,* 68 Nw.U.L. Rev. 503, 527 (1973). *See also,* Note, *Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964,* 84 Harv.L.Rev. 1109, 1267 (1971), where the author makes the distinction between a statutory proceeding and a statutory cause of action. For the view approving assessment of civil penalties, *see* Goldschmid, *An Evaluation of the Present and Potential Use of Civil Money Penalties as a Sanction by Federal Administrative Agencies,* 2 RECOMMENDATIONS AND REPORTS OF THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES (1972).

5. In *Block v. Hirsh,* the Court sustained the operation of a rent control commission established to cope with critical housing conditions in the District of Columbia caused by World War I. Mr. Justice Holmes wrote:

> "While the act is in force there is little to decide except whether the rent allowed is reasonable, and upon that question the courts are given the last word. A part of the exigency is to secure a speedy and summary administration of the law and we are not prepared to say that the suspension of ordinary remedies was not a reasonable provision of a statute reasonable in its aim and intent." 256 U.S. at 158, 41 S.Ct. at 460 (four justices dissenting).

The *Pernell* Court characterized the case in almost the exact language it had used to describe the *Jones & Laughlin* case in *Curtis v. Loether:*

> *"Block v. Hirsh* merely stands for the principle that the Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication." 416 U.S. at 383, 94 S.Ct. 1733.

6. While the Supreme Court opinion in *NLRB v. Jones & Laughlin, supra,* uses the words "statutory proceedings" and in *Curtis v. Loether, supra,* "administrative proceedings," a more precise term is "administrative adjudications." Obviously, such functions as rule making may be included within the scope of a "proceeding" but are not pertinent here.

1218

It is curious that while the Court was granting such a broad exemption for administrative adjudications it was enlarging the area of court cases where the jury would be available. It did so in a trilogy of cases beginning with *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), where the Court reevaluated the scope of equitable jurisdiction in view of the expansion of legal rights provided by the Federal Rules of Civil Procedure.

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), held that a jury trial on legal damage issues could not be withheld because the suit also included equitable claims which under past practice would have been adjudicated on the theory of "incidental jurisdiction" or the "cleanup" doctrine. *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), allowed a jury trial in a stockholder's derivative suit. The *Ross* Court again pointed out that the Federal Rules of Civil Procedure had eliminated the procedural distinctions between law and equity suits and that the value of the historical test based on these differences had been lessened. The Court noted that the legal nature of an issue is determined by considering (1) pre-merger custom with respect to such questions, (2) the remedy sought, and (3) the practical abilities and limitations of juries.[7] *Id.*, at 538 n. 10, 90 S.Ct. 733. The dissent in Ross v. Bernhard characterized the decision perhaps accurately:

"as a reflection of an unarticulated but apparently overpowering bias in favor of jury trials in civil actions." 396 U.S. at 551, 90 S.Ct. at 745.

Falling chronologically between *Dairy Queen* and *Ross* was *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), where a jury trial in a bankruptcy proceeding was denied. The Court held that a summary procedure to order the surrender of a voidable preference was not within the ambit of the Seventh Amendment. The opinion pointed out that the statute created bankruptcy tribunals as courts of equity which "deal in a summary way with 'matters of an administrative character . . .'" *Id.*, at 327, 86 S.Ct., at 471. Thus, *Katchen* is consistent with the treatment accorded administrative determinations[8] in NLRB v. Jones & Laughlin Steel Corp., *supra*, and furnishes some support for the Secretary's efforts to drape the cloak of equity over OSHA's shoulders.

Nevertheless, it would seem that reliance upon the claimed equitable coloration of the Occupational Safety and Health Act obscures the simple fact that this is an administrative adjudication. The Supreme Court's rulings to date leave no doubt that the Seventh Amendment is not applicable, at least in the context of a case such as this one, and that Congress is free to provide an administrative enforcement scheme without the intervention of a jury at any stage.

7. For an article suggesting that Congress is better suited to determine the adequacy or inadequacy of a jury trial in a statutorily created cause of action, *see* Note, *Congressional Provision for Nonjury Trial under the Seventh Amendment*, 83 Yale L.J. 401, 415 (1973). *Cf.* Note, *Application of Constitutional Guarantees of Jury Trial to the Administrative Process*, 56 Harv.L.Rev. 282 (1942). "The approach must be to discard the jury only where necessary, not whenever convenient . . ." *Id.*, at 294 (footnote omitted).

8. While recognizing that bankruptcy courts would be traditionally viewed as courts of equity where the right to a jury trial would not attach, the *Katchen* Court went further in saying, "[m]oreover, this Court has long recognized that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period,' . . . and that provision for summary disposition, 'without regard to usual modes of trial attended by some necessary delay,' is one of the means chosen by Congress to effectuate that purpose . . ." *Id.*, at 328–29, 86 S.Ct. at 472 (citations omitted).

The petitioner likens the assessment of these OSHA civil penalties to an *in personam* monetary judgment which can be obtained only in an action at law. But that similarity has not proved decisive to the Supreme Court. *Curtis v. Loether, supra,* 415 U.S. at 196, 94 S.Ct. 1005. We see no difference in the impact on an employer between an administrative award which requires him to pay a fixed sum of money to certain employees as in the *Jones & Laughlin* case and one which orders payment of a civil penalty to the United States.

▮ Our function is not to pass upon either the wisdom or desirability of such an administrative adjudicatory process. We are limited to deciding whether it is constitutional within the limitations set by the Supreme Court.[9]

There is a line beyond which Congress may not transfer traditional remedies from the courts to administrative agencies so as to evade the protection of the Seventh Amendment.[10] As so often with constitutional adjudications, such a point need not be defined with precision to cover all cases for all time. We only decide the case before us, and, as the panel previously held, that line has not been crossed in this case. For the reasons stated in the panel opinion of November 4, 1974, the Commission's decision finding a willful violation of 29 C.F.R. § 1926.652(b) is vacated and remanded for further consideration not inconsistent with this opinion and the order assessing penalties for violations of §§ 1926.652(h), 1926.401(f), 1926.150 (c)(1)(viii), 1926.350(a)(1), 1926.51 (c), and 1926.51(a)(1) will be affirmed.

9. We do not blindly accept a Congressional label as the dissent suggests but rather we defer to the Supreme Court's determination that the Seventh Amendment does not apply to this type of case. While the dissent differs with our reading of *NLRB v. Jones & Laughlin, supra,* we believe that the more recent cases of *Curtis v. Loether, supra,* and *Pernell v. Southall Realty, supra,* allow no other interpretation than the one we reached.

GIBBONS, Circuit Judge, dissenting, with whom Judges Aldisert and Hunter join.

I do not intend to repeat here the argument set forth in my dissent from the original panel decision in this case. Nothing advanced during its en banc consideration has moved me from the belief that the Supreme Court has yet to reach the seventh amendment issues as presented in the context of penalty proceedings under the Occupational Safety and Health Act. In essence, the en banc majority takes issue with my treatment of *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Today, I will direct my discussion to the majority's consideration of the seventh amendment issue in light of that decision.

The majority reasons that while the Supreme Court has recognized three broad generic categories of litigation:

1. Legal proceedings in courts;

2. Equitable and admiralty cases in courts; and

3. Administrative adjudications;

the Court has found a mandate for a jury trial only in the first classification.

The classification serves to define the issue. It recognizes, and I acknowledge, that if a case is one which in 1791 would have been within the jurisdiction of equity or admiralty it does not implicate the seventh amendment. But it seems clear that the seventh amendment was intended to prevent both federal equity and federal admiralty from swallowing up the jurisdiction of courts of law which afforded jury trials. It was over that very issue that the long battle concerning the extension of admiralty jurisdiction to inland waters was fought,[1]

10. *See* JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 87-94 (1965); 1 Davis, Administrative Law Treatise § 2.12 (1958).

1. C. Swisher, The Taney Period 1836-64, at 423-47 (1974) (Volume V of the Oliver Wendell Holmes Devise History of the Supreme Court of the United States).

and out of which the "saving to suitors clause" evolved even before adoption of the seventh amendment.[2] Neither the equity jurisdiction nor the admiralty jurisdiction are relied upon by the majority as a justification, in this case, for authorizing the imposition of an *in personam* money judgment without a jury trial.

Our difference then, is solely over the third category, those involving "administrative adjudication." At the outset it is well to recall that the term appears nowhere in the Constitution. In particular, it appears nowhere in Article III, § 2 which defines the categories of cases to which, and parties upon whom, the judicial power of the United States may be brought to bear. Only two of the clauses in Article III, § 2 are relevant to this case:

  (1) "The judicial Power shall extend to all cases, in Law and Equity, arising under this Constitution, the Laws of the United States . . . , and

  (2) "—to Controversies to which the United States shall be a Party . . . ."

It might be argued that since the seventh amendment by its terms, applies only to suits at common law, the amendment limits only the first clause of Article III, § 2; that is, that it refers only to federal question cases in law. It might be further argued that the broader language "Controversies to which the United States shall be a Party", since it does not repeat the "Law and Equity" language of the first clause, is not modified by the seventh amendment. Under that interpretation, in any suit to which the United States was a party, including a suit to collect money, a jury trial would be a matter of legislative grace. But that interpretation clearly proves too much, since the grant of diversity jurisdiction in Article III, § 2 is also "to Controversies" rather than to "Cases, in Law and Equity." Yet, no one has ever suggested that the seventh amendment is inapplicable to diversity cases. Thus, I assume, as does the common consensus, that the seventh amendment applies to the entire judicial power of the United States to the extent that the exercise of that power involves suits at common law. I also assume, and I do not suppose the majority disagrees, that the seventh amendment binds the entire federal government, not merely the Article III courts. I also assume that Congress could not confer the entire diversity jurisdiction, including suits at common law, upon a non-Article III tribunal sitting without a jury. Nor, I suppose, would the case be different

2. The "saving to suitors" clause was enacted as part of § 9 of the Judiciary Act of 1789 in which Congress vested the district courts with the admiralty jurisdiction authorized by Article III. § 2 of the Constitution. Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 76–77. It provided in pertinent part:

  "[T]he district court . . . shall also have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction . . . saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it . . . ."

This provision, in somewhat altered form, is now codified in 28 U.S.C. § 1333(1). Its effect is to permit a suitor

  "who holds an *in personam* claim, which might be enforced by suit *in personam* in admiralty, [to] also bring suit, at his election, in the 'common law' court—that is,

by ordinary civil action in state court, or in federal court without reference to 'admiralty', given diversity of citizenship and the requisite jurisdictional amount." G. Gilmore & C. Black, The Law of Admiralty § 1–13, at 37 (2d ed. 1975).

Neither the majority nor the government rely upon *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932) which upheld the validity of an award made pursuant to the Longshoreman's and Harbor Workers' Compensation Act. 33 U.S.C. § 901 *et seq.* The Act referred the adjudicative process to an administrative agency, and enforcement of the agency award to the district court. The Supreme Court upheld the procedure, finding no violation of Article III by virtue of Congress' authorizing adjudication by an administrative agency in the first instance rather than by a constitutional court.

if Congress called those non-Article III adjudicators "administrators" rather than "judges."[3]

But if the majority is right about this case, then my last two assumptions are dead wrong, for nothing in the majority opinion gives any definition to the term "administrative adjudications" other than to simply recognize the label which Congress has fastened upon it. Indeed, that is precisely the government's position. When at oral argument the attorney appearing for the government was asked to suggest a standard by which an "administrative proceeding" falling outside the reach of the seventh amendment could be identified, the only standard he could suggest was the label Congress attached. The majority opinion, although it gives passing lip service to the principle of judicial review, embraces this position by totally omitting any attempt to give content either to the seventh amendment term "Suits at common law" or to its term "administrative adjudication." The extent of its analysis is in three sentences:

"There is a line beyond which Congress may not transfer remedies from the courts to administrative agencies so as to evade the protection of the Seventh Amendment. As so often with constitutional adjudications, such a point need not be defined with precision to cover all cases for all time. We only decide the case before us, and, as the panel previously held, that line has not been crossed in this case."

(Majority opinion at 1219) (footnote omitted).

But how do we know the line has not been crossed if we are not told where it is? What neutral principle was brought to bear in deciding that this case fell on the permissible side of the invisible line?[4] There is only one discernible to me in the majority's opinion—that urged by the government. The line is wherever Congress says it is.

If this is the teaching of the one authority upon which the majority relies, then unbeknownst to the world of legal scholarship, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), affected the most profound and enormous redistribution of power among the three branches of the federal government of any case in the Court's history. I had thought until today that the Court, not Congress, was

3. *See generally* H. Hart & H. Wechsler, The Federal Courts and the Federal System 396–401 (2d ed. 1973). Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L.Rev. 1362 (1953).

4. In analyzing the import of *Glidden v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed. 2d 671 (1962), in which the Supreme Court held the Court of Customs and Patent Appeals and the Court of Claims to be Article III courts, the authors of a leading text pose the following questions:

"Justice Harlan is clearly correct, is he not, when he states that the reason there is no right to trial by jury in the Court of Claims is not because the Court of Claims is not a 'constitutional' court, but because suits against the United States—whether in the Court of Claims or in a district court—are not suits 'at common law' within the meaning of the Seventh Amendment?

But what if a non-Article III court were to be given jurisdiction in a case that *is* a suit at common law within the meaning of the Seventh Amendment? Can it be argued that the very fact that the delegation is to a non-Article III court makes the Seventh Amendment inapposite (or perhaps that the factors justifying delegation to such a tribunal also affect the application of the Seventh Amendment)? If so, is this an argument in favor of or against Congressional power to make such a delegation?"

H. Hart & H. Weschler, *supra*, note 5, at 399–400. (emphasis in original).

See the discussion of Crowell v. Benson, *supra*, in connection with the limitations on the jurisdiction of Article III court enforcement of administrative penalties in Professor Hart's celebrated "Dialogue." Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362, 1374–79 (1953). Such refined analysis as is presented in these materials ought to suggest to the majority, the necessity for closer scrutiny of Congressional "labeling."

the final arbiter of the lines drawn in the Constitution. But if Congress can by fiat define the term "administrative adjudication" and thereby necessarily define the seventh amendment term "Suits at common law", what role do the Article III courts play? I have already referred to the possibility of administrative diversity cases. Can Congress, acting under its commerce clause powers refer all contract cases affecting interstate commerce to an "administrative" non-jury adjudicator? And in a sixth amendment context, can Congress "decriminalize" a whole range of conduct and refer enforcement of federal policies to an administrative civil commitment agency? Think of the judicial resources that would have been saved had that approach been taken during the Vietnam War with respect to the Selective Service Act. It is true, of course, that in either a sixth or a seventh amendment context, the elimination of a jury trial would still leave operable the due process protection of the fifth amendment. Thus some form of judicial review would remain.[5] But my point is that whether we are dealing with the sixth amendment guaranty of a jury trial "in all criminal prosecutions," or with the seventh amendment guaranty of a jury trial "[i]n Suits at common law," the constitutional scheme of things requires that the Court, not Congress, give meaning to the Constitutional terms, and thereby define the limits of administrative proceedings.[6]

I suggest, moreover, that the Court has already done so with respect to the seventh amendment. In *Pernell v. Southall Realty*, 416 U.S. 363, 370, 94 S.Ct. 1723, 1727, 40 L.Ed.2d 198 (1974), Justice Marshall, upholding the right to a jury trial in an action for possession of land, quoted with approval the def-

inition of actions at law in *Whitehead v. Shattuck*, 138 U.S. 146, 151, 11 S.Ct. 276, 34 L.Ed. 873 (1891):

"[it] would be difficult, and perhaps impossible, to state any general rule which would determine in all cases what should be deemed a suit in equity as distinguished from an action at law . . . ; but this may be said, that where an action is simply for the recovery and possession of specific, real, or personal property, *or for the recovery of a money judgment*, the action is one at law." (emphasis supplied).

The so-called "administrative adjudication" in this case never had any object other than the recovery of a money judgment, yet the majority simply acceeds to the Congressional determination that it is not an action at law.

I stated earlier that *NLRB v. Jones & Laughlin Steel Corp., supra*, was the one authority upon which the majority relies. It is true that neither *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) nor *Pernell v. Southall Realty, supra*, to which the majority refers, actually support the conclusion that the Court, not Congress, must determine the contents of the constitutional term "Suits at common law." Both upheld demands for jury trial, the first in a suit for damages for violation of Title VIII of the Civil Rights Act of 1968, and the second in a suit for possession of land pursuant to the summary dispossess statute of the District of Columbia. In each case the Court distinguished *Jones & Laughlin* which was raised as a bar to jury trial, as an administrative proceeding. But neither case can be read for the proposition that by calling something an "administrative adjudication" Congress can decide to handle "Suits at common law"

---

5. *See generally* H. Hart & H. Wechsler, The Federal Courts and the Federal System 396–97 (2d ed. 1973).

6. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judi-

cial department to say what the law is.") ; *United States v. Nixon*, 418 U.S. 683, 703–05, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) ("We therefore reaffirm that it is 'emphatically the province and duty' of this Court 'to say what the law is' . . . .")

without jury trials. No more could have been intended by these distinguishing references to *Jones & Laughlin* than to indicate the Court's approval of congressional delegation of Article I power to an administrative agency in cases in which that procedure is constitutionally permissible. As I said in dissenting from the panel decision, there is no constitutional prohibition against referring matters of an equitable nature to an administrative fact-finding tribunal and back pay incidental to injunctive relief is a traditional equitable remedy. The approving citation of *Whitehead v. Shattuck* in *Pernell v. Southall Realty*, quoted earlier, should dispel any motion that the Court reads *Jones & Laughlin* as a major surrender of the power of judicial review.[7]

The majority quotes that part of the *Jones & Laughlin* opinion which refers to a "statutory proceeding." One thing that is clear from *Curtis v. Loether*, and *Pernell v. Southall Reaty*, is that both decisions flatly reject any distinction between "Suits at common law" and "statutory proceedings." Both cases involved statutory proceedings. The first was a statutory proceeding seeking recovery of a money judgment for housing discrimination. It was held to be an action at law. The second was a statutory proceeding seeking possession of land. It, too, was held to be an action at law. Thus the fact that the proceeding is statutory is simply irrelevant; as irrelevant as the fact that all federal judicial proceedings are statutory since all federal jurisdiction is statutory.

Moreover the majority quotation from *Jones & Laughlin* is no authority for the proposition that if Congress has relegated the proceeding to an administrative agency the seventh amendment does not apply. I read the quote with the following emphasis:

"It is argued that the [back pay award] is equivalent to a money judgment and hence contravenes the Sev-

enth Amendment with respect to trial by jury. The Seventh Amendment provides that 'In suits at common law, where the value in controversy shall exceed twenty dollars; the right of trial by jury shall be preserved.' The Amendment thus preserves the right which existed under the common law when the Amendment was adopted. [Citations omitted]. *Thus it has no application to cases where recovery of money damages is an incident to equitable relief even though damages might have been recovered in an action at law.* [citations omitted]. It does not apply where the preceeding is not in the nature of a suit at common law. [citation omitted].

The instant case is not a suit at common law or in the nature of such a suit. The proceeding is one unknown to the common law. It is a statutory proceeding. Reinstatement of the employee and payment for time lost are requirements imposed for violation of the statute and are remedies appropriate to its enforcement. The contention under the Seventh Amendment is without merit." 301 U.S. at 48–49, 57 S.Ct. at 629. (emphasis supplied).

To rely only on the paragraph referring to statutory proceedings unknown to the common law is to distort Chief Justice Hughes' meaning. The suit was one in which the N.L.R.B. sought injunctive relief in the court of appeals, and incidental to that injunctive relief sought a back pay award. Of course an action for injunctive relief was unknown to the common law. No more can be read into *Jones & Laughlin* than the rejection of a demand for jury trial in the equitable enforcement proceeding. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 443–447, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (Rehnquist, J., concurring).

I would concede, however, that Chief Justice Hughes wrote with less than usual precision in the quoted portion of

---

7. *But see* Note, Due Process and Employee Safety; Conflict in OSHA Enforcement Procedures, 84 Yale L.J. 1380, 1380 n. 5 (1975).

the opinion. To understand why he may have done so, the case should be viewed in its historical setting. The decision was handed down on April 12, 1937, having been argued with four other Wagner Act cases on February 10 and 11, 1937. The back pay issue was peripheral in the extreme. *Jones & Laughlin* involved a frontal attack upon the power of Congress, acting under the Commerce Clause, to regulate the relations between an employer and an employee engaged in production or manufacture. The attack had succeeded in the Fifth Circuit in June of 1936. *NLRB v. Jones & Laughlin Steel Corp.*, 83 F.2d 998 (5th Cir. 1936). In many quarters it was expected to succeed in the Supreme Court as well since the Court only recently had struck down the N.I.R.A.,[8] the A.A.A.,[9] the Guffey Coal Conservation Act,[10] and the New York minimum wage law.[11] In the election in November of 1936, President Roosevelt not only won reelection with 523 out of 531 electoral votes, but also enormously strengthened his party's power in Congress. On February 5, 1937, just five days before the argument in *Jones & Laughlin* the President sent his "court-packing" proposal to Congress.[12] Four days after the argument, Senator Wheeler introduced a joint resolution proposing an amendment to the Constitution which would permit Congress to overrule by a two-thirds vote a decision of the Supreme Court holding a federal statute unconstitutional.[13] On March 11, 1937, Senator O'Mahoney introduced a joint resolution proposing a constitutional amendment which would prohibit any lower federal court from holding a federal statute unconstitutional, and which would also prohibit such action by the Supreme Court unless two-thirds of the members thereof by specific and separate opinion found it so beyond a reasonable doubt.[14]

Thus *Jones & Laughlin* was *sub judice* during the 66 days of the Court's modern history when it found itself most completely isolated from the other two branches of federal government and most severely under attack. *See e. g.*, 2 Pusey, Charles Evans Hughes 749–65 (1951); R. Jackson, The Struggle for Judicial Supremacy 176–96 (1941); J. Burns, Roosevelt: The Lion and the Fox 291–304 (1956). The decision in *Jones & Laughlin* and the four other Wagner Act cases handed down the same day marked at least the beginning of the end of the Court's attempt to impose its subjective economic views on the nation in the guise of substantive due process.[15] But clearly the Wagner Act cases did not signal an end to the judicial review of congressional delegations of power. It is true that taken out of context, bits and pieces of the Court's *Jones & Laughlin* opinion sound very deferential toward congressional authority to decide what may be committed to an administrative adjudicator. A deferential tone in the climate of the times was perfectly understandable. Deference by the Court to Congress in one set of circumstances, however, cannot be regarded as permanent surrender of constitutional authority. *Compare Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1869), with *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 19 L.Ed. 332 (1869).[16]

---

8. *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935).

9. United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936).

10. *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936).

11. *Morehead v. New York ex rel. Tipaldo*, 298 U.S. 587, 56 S.Ct. 918, 80 L.Ed. 1347 (1936).

12. H.R.Doc.No.142, 75th Cong., 1st Sess. (1937).

13. S.J.Res. 80, 75th Cong., 1st Sess. (1937).

14. S.J.Res. 98, 75th Cong., 1st Sess. (1937).

15. *N.L.R.B. v. Fruehauf Trailer Co.*, 301 U.S. 49, 57 S.Ct. 642, 81 L.Ed. 918 (1937); *N.L.R.B. v. Friedman-Harry Marks Clothing Co.*, 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921 (1937); *Associated Press v. N.L.R.B.*, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937); *Washington, Virginia & Maryland Coach Co. v. N.L.R.B.*, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965 (1937).

16. The history of the restoration of the Court's authority from *McCardle* to *Yerger* to pass

*Jones & Laughlin* should be read not expansively, as the majority reads it, but cautiously, and with a thoughtful appreciation of the circumstances surrounding its announcement. Neither the Wheeler nor the O'Mahoney amendments nor Roosevelt's "court-packing" plan ultimately succeeded, and it is still the Court, not Congress, which must ultimately give meaning to the seventh amendment.

The term "statutory proceedings" when referring to administrative proceedings is imprecise because it is overly generic. There are administrative proceedings in the nature of rule-making, rate-setting, or licensing which have nothing at all to do with this case. An earlier generation of judges probably would have called these proceedings legislative. *See e. g.,* Justice Holmes' description of rate-making in *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 53 L.Ed. 150 (1908). What the case *sub judice* involves is administrative adjudication, and the question is what kinds of adjudication can be relegated by Congress to decision by executive branch employees rather than by jurors?[17] One answer is that any adjudication which Congress decrees should be committed to the discretion of an executive branch employee may be so delegated. Although the majority opinion in the three sentences quoted earlier nods to the seventh amendment and to the integrity of Article III judicial review, in reality it has simply deferred to Congress' labeling of the proceeding as "administrative." The other answer is that given by the Supreme Court in Curtis v. Loether, and Pernell v. Southall Realty. Congress cannot relegate fact-finding to any tribunal other than a jury in any proceeding that was in 1791 a "Suit at common law," [18] Principled adjudication of the meaning of the constitutional term must be firmly rooted in the history of the common law, or the courts will be set adrift upon the same sea of subjectivity and arbitrariness which led to the great Court crisis of 1937.

In my dissent to the panel's opinion, I attempted at some length to demonstrate that a proceeding, the sole object of which is the obtaining of an *in personam* money judgment, is a "Suit at common law" and thereby deserving of seventh amendment protection. I again dissent because I am unwilling to accept the majority's view that an Article III court charged with interpreting the Constitution's mandate must blindly defer to a Congressional direction that the proceeding below be labeled something else. Although I am completely in sympathy with the goals Congress sought to achieve in enacting the Occupational Safety and Health Act, the limitations on the exercise of federal power as set forth in the Constitution must, however, be observed by the legislative branch. Scrupulous regard for such principles may often seem to delay the attainment of desirable social goals, but as artificial as they sometimes appear, in the long run, they serve the higher purpose of preserving constitutional government.[19]

upon the validity of congressional reconstruction by way of habeas corpus is recounted in 1 C. Fairman, Reconstruction and Reunion, 1864–1888, at 433–514, 558–618 (1971). (Volume VI of the Oliver Wendell Holmes Devise History of the Supreme Court of the United States).

17. *Cf.* Comment, The Authority of the Circuit Judicial Councils: Separation of Powers in the Courts of Appeals, 5 Seton Hall L.Rev. 815 (1974).

18. See note 6, *supra. See generally Albemarle Paper Co. v. Moody,* 422 U.S. 405, 443–447, 95 S.Ct. 2362, 44 L.Ed.2d 280 (1975) (Rehnquist, J., concurring).

19. *Muniz v. Hoffman,* 422 U.S. 454, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975) does not suggest a result on the seventh amendment issue different than I propose. There the Court had before it only matters of statutory construction and sixth amendment considerations in the context of "the historic rule that state and federal courts have the constitutional power to punish any [petty] criminal contempt without a jury trial." at 475, 95 S.Ct. at 2190. I would not suppose that executive branch agencies have a similar power. *See, e. g., ICC v. Brimson,* 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894).

GARTH, Circuit Judge, dissenting:

Although I agree with the *legal analysis* set forth by Judge Gibbons in his opinions dissenting from both the panel and en banc majorities, I disagree strongly with his *political analysis* (pages 1224–1225 of the en banc dissent) of the reasoning underlying the Supreme Court's decision in *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937). I am critical of any analytical approach which attributes a court decision to the political motivations and other extra-judicial considerations of the five Justices who joined in the majority opinion.

I do not believe that fear of "court-packing" or other "reprisals" governed the decisions of the Supreme Court in 1937 any more than I believe that considerations of "reprisal" or "reward" dictate the decision of members of the judiciary today. The "considerations" about which Judge Gibbons writes are not the product of evidence and are not matters of judicial record; they are rather political theories advanced by secondary source commentators. If true, they rent great tears in the fabric of justice; if false, they do an enormous disservice to dedicated Justices. In either event, these considerations add nothing to an otherwise analytical and compelling opinion dealing with the applicability of the Seventh Amendment to the issues presented here. Indeed, in advancing a hypothetical and pseudo-political analysis of considerations which might have motivated the court (an analysis better suited to a law review

note than an opinion), Judge Gibbons detracts from an otherwise scholarly dissertation.

I note, to set the record straight, that many of the Justices who ultimately constituted the majority in *Jones & Laughlin, supra*, had consistently been in the minority in those cases decided prior to the November 1936 election,[1] which are cited by Judge Gibbons in his opinion at 1224. In *Morehead v. New York ex rel. Tipaldo*, 298 U.S. 587, 56 S.Ct. 918, 80 L.Ed. 1347 (1936) Chief Justice Hughes and Justices Brandeis, Stone and Cardozo were the dissenters. When Justice Roberts joined Chief Justice Hughes and Justices Brandeis, Stone and Cardozo in *Jones & Laughlin*, the former dissenters finally became the majority. How can it be said that the "majority" vote which had been developing prior to the 1936 election was the sole product of post-1936 political considerations? I prefer not to indulge in political and historical speculation but to read a Supreme Court opinion for what it says. I perceive nothing in the *Jones & Laughlin* decision which in any way suggests that the result was based on other than proper judicial considerations based upon matters of record.[2]

Therefore, I disassociate myself from the dissent's political analysis, while at the same time joining in Judge Gibbons' otherwise excellent opinion, holding that the Seventh Amendment mandates a jury trial with respect to penalty proceedings under the Occupational Safety and Health Act.

1. *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) ; *United States v. Butler*, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936) ; *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) ; *Morehead v. New York ex rel. Tipaldo*, 298 U.S. 587, 56 S.Ct. 918, 80 L.Ed. 1347 (1936).

2. Even if there is validity in the contention that political considerations dictated the principal holding in *Jones & Laughlin*, (a contention which I do not accept), it is absurd

to suggest (as Judge Gibbons does in his opinion at 1223–1224) that every "peripheral" issue in that opinion is similarly controlled. Certainly Judge Gibbons does not demonstrate in his opinion nor is there any indication given in his historical analysis, that there was any prevailing political sentiment in 1937 *as to the "back pay/Seventh Amendment"* issue, the only issue relevant here. Resolution of this "peripheral" issue was by no means legally or analytically dictated by the Court's holding that the Act itself was constitutional.