UNITED STATES of America

v.

ATLANTIC RICHFIELD COMPANY,
a corporation.

UNITED STATES of America

v.

GULF OIL CORPORATION, a
corporation.

Civ. A. Nos. 75–3096, 75–3097, 76–947,
76–604, 75–3329, 75–3330, 75–3331,
75–3332, 76–601 and 76–603.

United States District Court,
E. D. Pennsylvania.

March 29, 1977.

Frank J. Bove, Asst. U. S. Atty., David W. Marston, U. S. Atty., Philadelphia, Pa., Robert N. deLuca, Chief Civil Asst. U. S. Atty., Philadelphia, Pa., for plaintiff; Douglas K. Miller, Dept. of Justice, Land & Natural Resources Div., Pollution Control Section, Washington, D. C., of counsel.

Eugene M. FitzMaurice, Philadelphia, Pa., John J. Fitzpatrick, Jr., Bala-Cynwyd, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

These cases raise issues concerning the proper construction and the constitutionality of the "civil penalty" provision of the oil and hazardous substance sections of the Federal Water Pollution Control Act Amendments of 1972 (FWPCA), § 1321(b)(6) of 33 U.S.C. §§ 1251 *et seq.* (Supp.1976).[1] The constructional issues boil down to whether Congress intended to impose the civil penalty on persons who spill oil accidentally, report such spill to the appropriate authorities, and clean it up at their own expense (hereinafter "accidental, reporting self-cleaners"). The constitutional issues of importance are: (1) whether a penalty imposed in such circumstances is irrational and, hence, a denial of due process; and (2) whether the penalty is in actuality criminal in nature so as to trigger various Sixth Amendment rights. Several other constitutional claims are raised, but they are of minor proportion and will only be footnoted.

The issues, at least to the extent that they are defined by the statutory context of the FWPCA civil penalty provision, are of first impression in this circuit. They are raised by Atlantic Richfield Co. (Arco) and Gulf Oil Corp. (Gulf) in their defenses to these ten government suits to enforce administratively assessed penalties. Arco is defendant in four of these cases, and Gulf

in six. The cases, which involve identical legal issues, were originally assigned to various judges of this court and were transferred to the undersigned by agreement of the parties. The parties have stipulated to the facts and have submitted the cases to us on cross motions for summary judgment.

The facts in each of the ten cases, so far as they are operative, are not only undisputed, but follow the same pattern. The statutory scheme, on the other hand, is complex and singular, and its meaning is very much in dispute. Since the "facts" are so thoroughly entwined in the statutory requirements that their significance is not apparent except in that context, we shall reverse our usual order of presentation and will sketch the statutory skeleton before fleshing it out with the facts upon which these cases are presented. We do so by summarizing (and paraphrasing) the key statutory provisions, also noting the statutory section number.[2] They provide as follows:

(a). that federal policy prefers "no discharges of oil . . . into . . . the navigable waters," § (b)(1);

(b). that such discharges "in harmful quantities" are prohibited, § (b)(3);

(c). that in case such discharge occurs, the "person in charge" of the discharging vessel or facility must notify the Coast Guard as soon as he knows, § (b)(5);[3]

(d). that failure to notify shall subject such person in charge to fine up to $10,-

---

1. The FWPCA fundamentally revised the existing structure of federal water pollution control law. The changes in the "oil" section, § 1321, are either minor or irrelevant to these cases. The basic provisions at issue were reenacted from the Water Quality Improvement Act of 1970, 84 Stat. 91, formerly codified at 33 U.S.C. § 1161.

We have jurisdiction over these actions under 33 U.S.C. § 1321(n). Because FWPCA contains this jurisdictional grant, we need not resolve the parties' dispute as to which other jurisdictional basis would be appropriate. The government claims that 28 U.S.C. § 1345, which provides for district court jurisdiction over any "civil action . . . commenced by the United States," is the proper basis. The defendants disagree and argue that 28 U.S.C. § 1355, providing jurisdiction over actions for

fines or penalties, is the relevant grant. We note this disagreement because it is symptomatic of the parties' fundamental disagreement about the character of these cases.

2. Hereafter all statutory references, unless otherwise noted, are to subdivisions of 33 U.S.C. § 1321.

3. We treat the Coast Guard throughout as the appropriate enforcement agency. Section 1321 has sometimes directly authorized the Coast Guard or the Secretary of the Department which includes the Coast Guard to carry out its provisions. At other times, the statute has delegated to the President who has delegated to the Coast Guard. *See, e. g.,* Executive Order No. 11735, 38 F.R. 21243 (1973); 33 U.S.C. § 1321 (Supp.1976).

000, or one year imprisonment, or both, *id.*;

(e). that such person shall be entitled to immunity from use of such notification *"in any criminal case,"* *id.*; (emphasis added)

(f). that the Coast Guard shall assess a *"civil penalty"* up to $5,000 upon the owner of a discharging vessel or facility ("discharger"), § (b)(6); (emphasis added)

(g). that in setting the amount of the civil penalty, the Coast Guard shall consider the "size of the business," the impact of the penalty on the survival of the business, and the seriousness of the violation, § (b)(6);

(h). that the Coast Guard shall issue regulations for the prevention of oil spills, the violation of which shall subject the discharger to a civil penalty up to $5,000, §§ (j)(1)(C) and (2);

(i). that unless the discharger himself satisfactorily cleans up, the Coast Guard shall clean up and the discharger shall be liable for the costs of removal within statutory limits, §§ (c)(1) and (f)(1), (2);

(j). that if the discharge "was the result of willful negligence or willful misconduct" the liability for clean up costs shall be unlimited, § (f)(1), (2);

(k). but that if the discharger can prove that the sole cause was an act of God, of war, or of governmental negligence, or the act (negligent or not) of a third party, then the discharger can recover the costs of removal from the third party or from the United States, §§ (g) & (i);

(*l*). that any penalties collected shall go into a revolving fund to be spent on cleaning up discharges, planning or coordinating for same, carrying out surveillance, et alia, § (k); and

(m). that prior common law or statutory damage remedies against spillers are not preempted, § (*o*).

■ The statutory scheme does not specify the object of the "use immunity" in "criminal cases" granted to those who disclose their discharges. Section 1321 has no criminal sanctions (except for the failure to report for which one obviously cannot gain immunity by reporting). We therefore must look beyond the statute for a referent and, by so doing, conclude that the object of the § 1321 immunity is the ancient Refuse Act, or Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 407, 411. That Act provides that dischargers of oil (and other substances) shall be liable for a criminal fine up to $2,500 or imprisonment up to one year, or both. We do not mean that the (b)(5) immunity is limited to Refuse Act violations. But we know of no other criminal sanction to which it has been found appropriate.

Turning now to the operative facts, we note that the stipulations as to the relevant events in each of the cases before us track essentially the same pattern. In each case either Arco or Gulf owned or operated a vessel or facility from which oil was discharged in harmful quantity into the navigable waters of the United States. The discharges were "accidental" or "unintentional," but, perforce, they violated the prohibition on discharge of (b)(3); hence, without more, they subjected the owners (defendants) to liability for the civil penalty under (b)(6). However, the appropriate defendant (or its agent) promptly reported each spill and cleaned it up within the limits of technological feasibility and to the satisfaction of the Coast Guard. Despite defendants' compliance with their reporting and clean up duties, the Coast Guard, following the prescribed administrative procedure, assessed a civil penalty in each case. Upon defendants' refusal to pay, the government sued.

Proceeding from the factual pattern to specific examples, we note that the actual stipulations add very little. For instance, in two of the actions against Gulf (C.A. 76–601 and 603) we are told in one case only that "a faulty float valve on a sump pump . . . became stuck . . . allowing . . . oil to discharge," and in the other only that "oil from saturated ground . . . somehow reached the water table . . .." (Stipulation between United States and Gulf at 1). The stipulations between the Government and Arco are similarly cryptic.

In C.A. 75–3096, "there was an overflow of heavy fuel from the West Yard Oil-Water separator . . .;" and, in C.A. 75–3097, "a manifold . . . developed a leak . . .." The stipulations do not show any person either to have caused the spills or not. Nor do they suggest either due care or a lack of due care on the part of Arco and Gulf. However, the Government does not contest defendants' claim that the spills were "accidental;" i. e., unintentional or nonwillful.

Defendants contend that where a discharge is accidental, either the reporting, or the cleaning up, or the combination of both, insulates them from (b)(6) liability. They characterize an accidental, reporting, self-cleaner as absolutely without fault. As a matter of statutory construction they argue: (1) that the scope of the (b)(5) immunity in "criminal case[s]" should be construed to reach (b)(6) penalties against accidental, reporting, self-cleaners; and (2) that the determination of whether (b)(3) was violated by a harmful discharge should measure harmfulness in light of the clean up results. Defendants' due process contention is that to impose the clean up costs attributable to those who do not report their spills and do not get caught upon accidental, reporting, self-cleaners is shocking to the conscience or, at least, irrational. Their claim to a Sixth Amendment jury trial and its incidents relies on the converse of their "statutory" claim; namely, that the statutory scheme and its legislative history[4] demonstrates punitive intent and must be treated as creating a criminal penalty.

For the reasons that follow we have rejected both the constructional and constitutional arguments of the defendants.

Hence, we will deny the defendants' motions for summary judgment and grant those of the Government and enforce the penalties. In so doing, we are in accord with the weight of authority; but there is precious little authority on (b)(6). The recent Fifth Circuit decision in *United States v. LeBoeuf Bros. Towing Co., Inc.,* 537 F.2d 149 (5 Cir. 1976) cert. denied, —— U.S. ——, 97 S.Ct. 1688, 52 L.Ed.2d 383 (1977) rejected a similar multifaceted attack upon (b)(6)'s predecessor section;[5] yet we are unable to rest on that opinion because the defendants in the instant case raised issues not dealt with in *LeBoeuf.*[6] On particular issues we found helpful several district court opinions: *United States v. W. B. Enterprises, Inc.,* 378 F.Supp. 420 (S.D.N.Y.1974) (effect of clean up on determination of a (b)(3) violation); *United States v. Independent Bulk Transport, Inc.,* 394 F.Supp. 1319 (S.D.N.Y.1975) (scope of judicial function under (b)(6)). *See also United States v. Eureka Pipeline Company,* 401 F.Supp. 934 (N.D.W.Va.1975); and *United States v. Mar-Tee Contractors,* 8 E.R.C. 1925 (D.N.J.1976).

None of the above cases offers any support to defendants. Indeed, the only (b)(6) case which gives any aid to defendants is *United States v. General Motors Corp.,* 403 F.Supp. 1151 (D.Conn.1975). While *G.M.* did hold that proof of faultlessness was not a total defense to (b)(6), it also granted the defendant a trial *de novo* on the issues of fault and, on the basis of its findings of faultlessness, reduced the assessed penalty to $1 nominal damages. However, we have not been asked to conduct a *de novo* trial on the issue of fault so as to consider reduction in penalties,[7] though we doubt in any event, notwithstanding Judge Clarie's thoughtful analysis in *General Motors*, that we have

---

4. On the issues of congressional intent raised at various junctures in this case, we have not adverted to legislative history because such history as arguably relates to the specifics of § 1321, a small part of a large statute, is sparse and ambiguous. Indeed, defendants have cited this history both to prove punitive intent and to disprove it, depending on the immediate needs of their argument.

5. *See* note 1, *supra.*

6. The district court in *LeBoeuf* had refused to enforce the "civil penalty," 377 F.Supp. 558 (E.D.La.1974); but the Court of Appeals reversed.

7. The fines range from $100 up to $4000 for the instant cases.

the power to consider the penalty assessment *de novo.*[8]

We turn now to the defendants' statutory arguments after which we will consider their constitutional claims.

## II. *Statutory Construction*
### A. *Introduction*

Congress, in the apparently plain language of § 1321(b)(3) and (6), mandated that the Coast Guard assess a "civil" penalty against any person who owns or operates a vessel or facility from which oil has been discharged in harmful quantities into the navigable waters. Congress created no exceptions or defenses to a (b)(6) suit other than denial that the elements of a violation had been proved. It is equally plain that Congress, in granting immunity to the person in charge of such vessel or facility from the use of information derived from his fulfilling his duty to report, specified that the immunity ran only to "criminal case[s]." § 1321(b)(5). The government argues that the statutory provisions are so clear that there is no room for judicial construction beyond the statute's plain meaning to somehow encompass the (b)(6) penalty within the immunity provision or to relieve accidental, reporting, self-cleaners from liability.

█ It is, of course, black letter law that the *plain terms* of a statute ordinarily control construction. *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *March v. United States,* 165 U.S.App.D.C. 267, 506 F.2d 1306, 1313 (1974). But there are exceptions to this "rule" under which a

> court may look beyond the express language of a statute in order to give force to Congressional intent: where the statutory language is ambiguous, and where a literal interpretation would thwart the

purpose of the over-all statutory scheme or lead to an absurd result.

*International Telephone and Telegraph Corp. v. General Telephone and Electronics Corp.,* 518 F.2d 913, at 917–918 (9th Cir. 1975).

The defendants contend that (b)(6), as applied, falls under one of the exceptions to the "plain terms" rule. They suggest that the history and purpose of the statute reveal ambiguities and that the proposed application of the penalty would not serve or would actually frustrate one or another statutory purpose. As we understand it, their statutory arguments fall under two broad categories. Under the first, they seek to convince us that the "criminal case[s]", from which (b)(5) extends immunity to those who report their own spills, should be construed to include actions for (b)(6) penalties against accidental, reporting, self-cleaners. The second category relates to the meaning of the prohibition on "harmful" discharges; the defendants contend that if the clean up effort has mooted the harm, it should preclude the penalty.

### B. *Is a (b)(6) Penalty Action a (b)(5) Criminal Case?*

Most of defendants' statutory argument is designed to convince us that we should construe the phrase "criminal case" in (b)(5) as including the instant (b)(6) actions. The bases for that claim are three. First, defendants claim that, as applied to accidental, reporting, self-cleaners, (b)(6) is really criminal rather than civil because, where defendants are not at fault, the penalty serves none of the ends of civil regulation, but acts only as a punishment. Second, defendants rely on the Supreme Court decisions in *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) and *Kennedy v.*

---

**8.** The Supreme Court has stated that

> *de novo* review is authorized [only] when the action is adjudicatory in nature and the agency factfinding procedures are inadequate.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

We are inclined to agree with Judge Frankel's conclusion that under *Overton Park* a (b)(6) penalty would never be appropriate for *de novo* review because the statute mandates adequate agency factfinding procedures. *United States v. Independent Bulk Transport, Inc.,* 394 F.Supp. 1319, 1323, n. 8 (S.D.N.Y.1975).

*Mendoza-Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) as establishing that in cases that turn on the difficult distinction between civil and criminal sanctions, the courts will look beyond the label to the true nature of the sanction. Third, defendants argue that because the grant of immunity is necessary to secure the information requisite to assure clean waters, its scope should be broadly construed to achieve, rather than to frustrate, its purpose.

### 1. *Faultlessness and Civil Regulability*

The first prong of defendants' argument goes as follows: The stipulated facts would not survive a motion to dismiss for failure to state a claim under the common law of negligence; *i. e.,* although the facts reveal "accidental" spills, they do not reveal a basis for inferring that defendants caused the spills through a lack of due care; but "negligence" is the lowest level of "fault" recognized by our law; *i. e.,* non-negligent conduct is reasonable conduct; therefore, if the spills were not negligent, we can infer that there was no reasonable means for defendants to prevent the spills.

We find that defendants' argument makes most sense when translated into simple economic terms. A rational owner of an oil facility, recognizing his potential liabilities for clean ups under § 1321 (and for damages under common law damage remedies which § 1321 leaves untouched), will attempt to minimize the costs of spills. To accomplish this he will calculate the mar-

ginal costs of preventing spills and of potential liabilities. He will thereupon engage in prevention to the point where the marginal cost of prevention equals his marginal liability for spills. Because that point defines *reasonable* spill prevention, a reasonable person will spend money for just that much prevention and no more. To spend less would be negligent. *See United States v. Carroll Towing Co.,* 159 F.2d 169 (2d Cir. 1947); Posner, *Economic Analysis of Law* (1972). To spend more would be wasteful or inefficient. *See* Ackerman, *Economic Foundations of Property Law,* at xi–xiv (1975) (brief definition and analysis of efficiency).

On this basis we can make some sense of defendants' argument that (b)(6) serves no regulatory purpose when applied to "faultless" spillers.[9] But defendants move from the claim that they were "faultless" to the claim that no regulatory purpose would be served by imposing a (b)(6) penalty, an argument we reject because it proceeds from a faulty premise. While it is true that the stipulated facts about the spills themselves would not be sufficient to support an action in negligence, this is not such an action, but rather an action to enforce a penalty.

The elements of this statutory action are only that defendant violated (b)(3) and that the Coast Guard following the appropriate procedure assessed the (b)(6) penalty. The statute does not make "fault" an element of the cause of action, but rather a factor in the administrative penalty setting procedure.[10] This is proper because

---

**9.** The potential (b)(6) liability will, of course, effect the calculation of potential costs, i. e., it will increase the marginal cost of spilling, but will leave the marginal cost of prevention unchanged. However, given the existence of a maximum statutory penalty (of $5000), there will certainly be some cases in which an owner will find it cheaper to take the risk of spilling than to prevent it. See, e. g., the discussion of the *General Motors* case, *infra,* at note 14.

**10.** Congress said in (b)(6) that "gravity" is to be one factor to be considered in setting the amount of the penalty. The Coast Guard has construed "gravity" as incorporating the factors of common law negligence. *See* Commandant Instruction 5922.11B which authorizes "in

weighing the gravity of the violation" the following considerations:

(1) Was the discharge intentional?

(2) Could the discharge have been prevented using reasonable care?

(3) Was the discharge caused by an act or omission of a type previously attributable (according to official records) to that same owner/operator so as to place him on notice of the particular hazard?

(4) Was the cause of the discharge a violation of the prevention regulations? Note that a *separate* violation may have occurred under Section 311(j).

(5) Did the owner/operator take special steps to try to avert the specific discharge?

there is no principle of law which requires that civil regulability through imposition of penalty be predicated upon a finding of fault. Moreover, a number of factors support civil regulability here in the absence of fault. First, as we explain more fully in our discussion of the Constitutional issues, *infra*, the principal goal of (b)(6) is to *deter* spills. Second, the Congressional purpose here was to impose a standard of conduct higher than that related just to economic efficiency. Additionally, the Congress obviously believed: (a) that no clean up effort could be complete because, after discharge, it is impossible to guarantee against residual harm from quantities of oil too small or too well dispersed to be detectable; and (b) that even the transitory pollution of waters was deleterious to the environment. *See also* note 15, *infra*.

■ We concluded earlier that we have no power to conduct a *de novo* trial to establish the correct penalty; but we do, of course, have the power of judicial review under the Administrative Procedure Act of 1966, 5 U.S.C. § 551 et seq. That Act provides that adjudications, § 554, made at agency hearings, § 556, shall be subject to "judicial review in civil . . . proceedings for judicial enforcement," § 703, under the "substantial evidence" test, § 706(2)(E). Actions to enforce (b)(6) penalties are appropriate occasions for such judicial review; however, despite our invitation, defendants have not brought the administrative record

before us. Our task, at this juncture, is but to construe the statute.[11]

■ In view of the foregoing analysis we must reject defendant's contention that, as applied to accidental, reporting, self-cleaners, (b)(6) is really criminal rather than civil because, (1) the statutory language is not ambiguous; and (2) even where defendants are not at fault, the penalty does not act only as a punishment but serves the ends of civil regulation.

### 2. *Trop, Mendoza-Martinez and the Matter of Labels*

In addition to their claim about fault and regulability, defendants argue that the *Trop* and *Mendoza-Martinez* line of cases announces a general judicial duty to police the use of the terms civil and criminal.[12] They contend that the use of these labels in § 1321 distorts reality. Thus, they say, the (b)(5) immunity in "criminal cases" extends to the criminal sanctions of the Refuse Act, but that the immunity given by the right hand would be taken away by the left, if the (b)(6) penalty, which is in the same general range of severity as the Refuse Act penalty, applies to those just made immune.

■ Assuming arguendo that this is a bit of legislative legerdemain, we are convinced that the argument does not aid defendants' position. In *Mendoza-Martinez* the constitutionality of legislation divesting American citizenship turned on whether the sanc-

---

(6) Was the discharge "unforeseeable" by an experienced owner/operator knowing the weather, sea conditions and equipment?

(7) Was there a minimum amount of oil discharged?

11. Defendants' contention that (b)(6) as applied to accidental, reporting, self-cleaners serves no regulatory purpose is not solely constructional. Because it also sounds in due process, we have reserved our more theoretical response to the argument until the due process discussion. *See infra*, § III, B.

12. *Mendoza-Martinez*, 372 U.S. at 168–169, 83 S.Ct. at 568, lists a number of factors as relevant to determining whether a statute is penal or not:

[1] [w]hether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment,

[3] whether it comes into play only on a finding of *scienter*, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned . . . .

Defendants have requested that we perform a *Mendoza-Martinez* analysis at several points and for several reasons. We have each time declined their invitation to so engage ourselves; but one or another of the *Mendoza-Martinez* factors often appears in our discussion both of the constructional and of the constitutional issues.

tion was civil or criminal. Thus, judicial scrutiny of legislative label was required to prevent an unconstitutional exercise of power. Absent such constitutional considerations, the judicial function in statutory construction is to ascertain and apply the lawful will of the legislature. For that purpose, legislative labels are not suspect, but revelatory. If Congress chooses to call a dog, a "horse," this court's task would be to apply the regulations on "horses" to dogs. *See LeBoeuf*, 537 F.2d at 151–152. Thus, as a matter of statutory construction, since Congress called the penalty civil, we must presume that Congress did not intend for the immunity to apply. The *Mendoza-Martinez* line of cases does not apply here.

### 3. *Frustration of Purpose*

Taking another tack, defendants argue that the Congressional goal of minimizing harmful accumulations of oil in the waters will be frustrated by application of the (b)(6) penalty. In fact they interpret the primary statutory function as assuring that the government knows of each spill so that clean up will be assured. Their argument goes as follows. Oil accumulates whenever spills occur and clean up fails or is deficient. If the immunity is construed as not including (b)(6) within its scope, there may be some cases in which an owner spills, but fails to report because of the jeopardy of a (b)(6) penalty. If such spill occurs and is not discovered, then (b)(6) will have frustrated the clean water goal.

In support of a broad construction of the immunity, defendants cite *United States v. Mobil Oil Corp.*, 464 F.2d 1124 (5th Cir. 1972). In *Mobil*, the Court was faced with the issue whether a corporate owner of a facility could be a "person in charge" thereof, and so be entitled to immunity when its agent reported a spill. Holding that the immunity should be construed to reach the corporate claimant, the Court suggested that such a reading would best promote the statutory reporting and clean water goals.

██ But *Mobil* presented a much stronger case for a broad construction of the immunity than do our cases. For in *Mobil*

the term, "person in charge," which was to be construed, defined not only the recipient of immunity, but also the person obliged, on pain of criminal sanction, to report known spills. To have construed the term as not reaching the corporation would have been to have raised a significant threat of corporate indifference to reporting. Thus, the weight of opinion since *Mobil* has been that corporations are entitled to the immunity, *United States v. Republic Steel Corp.*, 491 F.2d 315 (6th Cir. 1974); *United States v. Skil Corp.*, 351 F.Supp. 295 (N.D.Ill.1972); and that they have the correlative duty to report, *Apex Oil Corp. v. United States*, 530 F.2d 1291 (8th Cir. 1976), *United States v. Houghland Barge Line, Inc.*, 387 F.Supp. 1110 (W.D.Pa.1974).

Additionally, the *Mobil* reasoning required only a minor expansion of the immunity; but the defendants' argument here would apply to any sanction placed by the statute on those who report their spills and would swallow up the whole penalty provision. For, any such sanction discourages reporting and creates a risk that some spills will go unreported—and perhaps undetected—until clean up becomes impossible. But it is clear that Congress was willing to run that risk in order to accomplish other goals. In fact, a self-reporter faces a whole series of liabilities or potential liabilities under § 1321. Congress chose to counter the risk of non-reporting not by relieving reporters of all burdens, but by granting an immunity *limited* to criminal cases and by imposing criminal sanctions for failure to report.

██ Finally we reject defendants' simplistic account of the statutory "goal." Even a casual reading of the statute makes it plain that Congress was concerned with more than assuring public notice of spills so that the public could clean up. Congress intended to prevent spills, rather than to be notified of them. Congress aimed at oil free waters, but also preferred to accomplish this with minimum public expense. We agree with *LeBoeuf*, 537 F.2d at 152, that the defendants "misconceive the multipurpose nature of the statutory scheme." Defendants' "frustration" argument thus

cannot succeed, and, notwithstanding their three pronged approach, their argument that the "criminal cases" from which (b)(5) extends immunity to those who report their own spills should be construed to include actions for (b)(6) penalties against accidental, reporting, self-cleaners must fail.

### C.  When is "harmfulness" to be determined?

■ Defendants contend that they have not violated the (b)(3) proscription on harmful discharges because their clean up vitiated the harm.  That is, they suggest that the appropriate time for determining the existence *vel non* of harmful quantities is after clean up rather than before.  The government supports the statutory view taken by the commandant of the Coast Guard; *i. e.*, that remedial action after a spill is totally irrelevant to the determination of harmfulness under (b)(3).  Commandant Instruction 5922.11A.  We agree, finding ourselves in concurrence on this issue with *United States v. W. B. Enterprises, Inc., supra*, the only decision to consider this argument.  That opinion concluded that the plain terms of the statute prohibited "discharge" in harmful quantities, and that Congress preferred that such discharges be prevented rather than merely mitigated.  In fact, Congress doubtless believed that after such a discharge, it was impossible to guarantee against residual harm, from quantities of oil that are too small or too well dispersed to be detectable.  Thus, we conclude that the Coast Guard's interpretation is proper, and reject defendant's "frustration" argument as well.  We turn now to defendants' constitutional contentions.

### III.  Defendants' Constitutional Contentions

#### A.  Introduction

■ In their original briefs, defendants only obliquely questioned the constitutionality of (b)(6) as applied.  And when, during oral argument, we inquired whether they intended to pursue and to develop their constitutional contentions, they at first replied negatively, but later reversed that position, and filed supplemental briefs in support of their constitutional claims.  While the defendants have freely mixed statutory and constitutional arguments in their briefs, we have attempted to separate them in this opinion.  We find that defendants raise two substantial constitutional questions, which we treat under the headings due process and criminal jury trial.[13]

---

**13.** We find that two other constitutional issues raised by defendants are not properly before us.  First, defendants claim that the statute creates a "whipsaw" (*Knapp v. Schweitzer*, 357 U.S. 371, 384, 78 S.Ct. 1302, 2 L.Ed.2d 1393 (1958) (Black, J., dissenting) by which their privilege against self-incrimination is being destroyed, and against which the Supreme Court has ruled.  *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968); *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).  They rely further on the language in *Boyd v. United States*, 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886), that "proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal" for purposes of the Privilege.  *See also United States v. United States Coin and Currency*, 401 U.S. 715, 718, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971); *Lees v. United States*, 150 U.S. 476, 14 S.Ct. 163, 37 L.Ed. 1150 (1893).  We do not rule on the relevance of these cases to (b)(5) immunity because corporations have no privilege against self-incrimination, *George Campbell Painting Corp. v. Reid*, 392 U.S. 286, 88 S.Ct. 1978, 20 L.Ed.2d 1094 (1968), and because none of the special factors upon which the courts have occasionally found that one person has standing to raise the constitutional rights of others are present here.  *See Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 2874–76, 49 L.Ed.2d 826 (1976); *Eisenstadt v. Baird*, 405 U.S. 438, 445–446, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).  *See generally*, Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court*, 71 Yale L.J. 599 (1962).

Second, defendants claim that, if we deny their claim to a criminal jury trial, they are at least entitled to a civil jury trial.  U.S.Const., Am. VII.  The Supreme Court has just rejected such a claim under penalty provisions almost identical to those involved in the instant cases.  *Atlas Roofing Co., Inc. v. Occupational Safety*

Preliminarily, we note that a common thread runs through defendants' statutory and constitutional arguments: their claim that they have acted with little or no fault and have caused a miniscule amount of harm. Yet, they contend, for this essentially faultless and harmless conduct, they are being subjected to the (b)(6) penalty in order to finance clean up of the spills of those who do not report and clean up. They conclude that because this scheme is unfair or "shocking," it violates due process, and that because this sanction is punitive, it must be treated as criminal for constitutional purposes.

### B. Due Process

The constitutional guarantee of "due process" has been applied by the courts in myriad situations. Defendants argue that the application of the (b)(6) penalty to persons who have spilled oil, irrespective of whether the spill was accidental or not, of whether the spiller reported or not, and of whether the spiller cleaned up or not, is unfair and "shocking to the conscience."

The Supreme Court has, of course, held that "conduct that shocks the conscience" can reach the level of a due process violation. *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). However, for forty years that Court has consistently applied only a rationality test to economic regulation of business. Justice Roberts, in an early formulation of that test, stated:

If the laws passed are seen to have a reasonable relation to a proper, legislative purpose and are neither arbitrary nor discriminatory, the requirements of due process are satisfied . . . .

*Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934). *Cf. Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), and *City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (similar test applicable to classifications challenged

under equal protection clause in absence of fundamental rights or suspect criterion).

It may well be that the two tests will overlap in some instances and lead to different results in others. For instance, in *Rochin* itself the forceable stomach pumping which shocked a majority of the Supreme Court could be argued to be a rational means for preventing the destruction of the evidence of a crime. But we shall not apply these tests separately because we have concluded that only the rationality test is appropriate in these circumstances.

■ Defendants contend that it is irrational to charge a penalty against those who report and clean up their discharges in order to build a fund to pay for cleaning up the spills of those who do not report and do not get caught. The government responds that the (b)(6) penalties go into the revolving fund, whose use includes surveillance of the waters and supervision of clean ups. Therefore, the government claims there is a sufficient rational nexus between the behavior being penalized and the purpose of the revolving fund.

It may, of course, be argued that the rational nexus is broken or nonexistent because Congress did not authorize the assessment of (b)(6) penalties according to the demands on the revolving fund, or that the penalty setting procedure does not lead to assessments that fairly correspond to the costs attributable to the activities of a given defendant.

We believe, however, that there is a rational nexus between the behavior being penalized and the purpose of the revolving fund, in part because of the use of the fund to supervise clean up, but mainly because of the magnitude of the Coast Guard's surveillance task, given the length and breadth of our coastline and navigable waterways, and the need for a fund to support that effort. We note too that an accidental, reporting, self-cleaner might not always be so. However, the principal rational basis for (b)(6)

*and Health Review Commission*, —— U.S. ——, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977). Since defendants suggest no basis on which *Atlas* can

be distinguished, we deny their civil jury trial claim.

as we see it lies not in the creation and use of the fund but in its deterrent purpose and the goal of preventing spills.

Earlier in the opinion we discussed briefly the notion of economic efficiency and its relationship to the legal notions of fault and deterrence. At that point we posited that the defendants' claim that they were faultless meant, in economic terms, that the marginal cost of prevention exceeded the marginal cost of clean up and damages. That posit rested on the "more is better" value concept which is central to classical economics. See Ackerman, supra. In that discussion we were trying to explain defendants' contention about fault, though we rejected them as being repugnant to the statutory intent. Now, however, we are not considering rationality as an economic notion but as a requirement of due process. We do not believe that the two are identical; i. e., we believe that Congress has the power to elevate other values over economic efficiency and that it can properly design statutes to promote such values. Moreover, while the test of whether the statute is rationally designed will often take the form of an economic efficiency analysis, that analysis may itself be subordinated to the ultimate non-efficiency goal.

It is widely recognized that the FWPCA policy subordinates economic efficiency to the goals of clean water. The general declaration of "goals and policy" includes the elimination of all polluting discharges by 1985. 33 U.S.C. § 1251. And § 1321 announces an immediate no discharge policy for oil and hazardous substances. On the level of abstract policy neither section yields to simple claims of economic efficiency or accepts pollution on the ground that its prevention would be unreasonably expensive. See Wildavsky, Economy and Environment/Rationality and Ritual, 29 Stan.

L.Rev. 183, 191 (1976). Indeed, Dean Wildavsky has presciently analyzed the clash of values that has led to the frustration which the defendants in our case express:

The exasperation with which [they] regard the behavior of the environmentalists and their political allies would be justified if everyone agreed the goals could be expressed in terms of economic rationality. Then the means to this end would indeed be perverse—spending much to gain little. . . . But it is precisely this mode of thinking in terms of opportunity costs to which environmentalists object.

. . . . .

If purification is what you are after, more is better than less and you would expect to pay more for each increment. Confusion enters because the transactions occur between two worlds, so that homage must still be paid to the old economic costs and benefits while choices are predicated on quite different environmental values.

It is clear that Congress has rejected the economic efficiency or rationality test as the ultimate test of value under the FWPCA. Nonetheless, it has chosen to use economic means—the (b)(6) penalty in order to deter spills. It is only in evaluating whether the economic sanctions are reasonably calculated to deter, hence to achieve the non-economic values that Congress has selected, that the test of economic rationality is appropriate. See Junger, A Recipe for Bad Water: Welfare Economics and Nuisance Law Mixed Well, 27 Case W.Res.L. Rev. 3, 9 n. 19 (1976). It is our judgment that the economic sanction of the (b)(6) penalty is reasonably calculated to deter and to achieve those values. Defendants' due process claim must therefore be denied.[14]

14. We do not gainsay that there may be cases where a given penalty may be deemed unconstitutional as applied. Although no due process defense was raised in United States v. General Motors, supra, a strong due process claim could have been made; for G.M. had: (1) shut down a plant; (2) drained and taken away all unneeded oil; (3) maintained two fences with barbed wire protecting the property—and the oil—from vandals; and (4) paid for several daily patrols of the premises. Nonetheless vandals entered the premises and released oil which flowed out into a navigable waterway. The Coast Guard assessed a $1,200 penalty.

General Motors contended that the statutory provisions, §§ 1321(g) and (i), which allow

## C. Right to a Criminal Jury and Its Incidents

Defendants also claim that the constitution guarantees them a criminal jury trial[15] and that in such a trial the government must prove them guilty beyond a reasonable doubt. *Cf. In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The starting point of their argument is *Mendoza-Martinez*. We have previously concluded that the penalty is civil and *Mendoza-Martinez* is inapplicable for purposes of statutory construction. The conclusion that (b)(6) is civil is subject to being reopened here because the issue is one of constitutional power. Nonetheless, we decline again to engage in a *Mendoza-Martinez* analysis because the Supreme Court has held, in a long line of cases, that a defendant is not entitled to the special rights accorded the criminally accused under the Fifth and Sixth Amendments when the government stands to win "a judgment for money only and not . . . a judgment which directly involves the personal safety of the defendant." *United States v. Zucker*, 161 U.S. 475, 481, 16 S.Ct. 641, 643, 40 L.Ed. 777 (1896). *See also Hepner v. United States*, 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720 (1909) (directed verdict against defendant proper); *United States v. Regan*, 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494 (1914) (proof beyond reasonable doubt unnecessary); *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938) (monetary penalty with "remedial character" may be imposed following failed criminal prosecution despite the proscription against double jeopardy). *Mendoza-Martinez* should not be read as undercutting the vitality of those cases; for in *Mendoza-Martinez* the penalty found to be criminal in nature was forfeiture of citizenship, which has been characterized as "man's basic right . . . the right to have rights." *Perez v. Brownell*, 356 U.S. 44, 78 S.Ct. 568, 579, 2 L.Ed.2d 603

proof that a "third party" (or an "Act of God") was the *sole cause* of the discharge to be a total defense to a suit by the United States for clean up costs, and which even allow the same proof to support an action by a self-cleaner to collect his costs from the government, must be interpreted as creating a complete (implied) defense to (b)(6). The Court rejected that claim, but found that there was insufficient *fault* to justify more than nominal $1 damages. If one considers the facts of *GM* in the instant due process context, we note that no penalty—even the $5,000 maximum—would be calculated to prevent such spills. The costs of totally vandal-proofing a large industrial facility or of providing continuous patrols of its perimeters would certainly be so great that the (b)(6) penalty would not lead to such measures. The *General Motors* court concluded that G.M. was faultless, apparently on the ground that G.M. could not reasonably have prevented the vandals from causing the spill:

the defendant was not negligent or at fault in any way for this discharge of oil. In other words, its culpability was zero . . . .

*Id.* at 1164. But in such a case the implication of the due process rationality analysis is that no (b)(6) penalty is appropriate because deterrence is not possible in view of the *gross* extent to which the marginal cost of prevention would have exceeded the potential clean up and damage liability *plus* the potential (b)(6) liability. In such a case (b)(6) would not seem to deter and, might therefore be deemed irrational. But, to repeat, that is not the case here.

15. Several scholars have debated the issue of whether congressional choice between the civil and criminal labels can ever effect a defendant's entitlement to criminal procedural rights guaranteed by the constitution. *See generally* Goldschmid, *An Evaluation of the Present and Potential Use of Civil Money Penalties as a Sanction by Federal Administrative Agencies*, Report to the Administrative Conference of the United States (1972) (recommending increased use of "civil" money sanctions, administratively imposed, precisely because such sanctions avoid the delays and constitutional protections surrounding criminal and civil sanctions judicially enforced); and Charney, *The Need for Constitutional Protections for Defendants in Civil Penalty Cases*, 59 Corn.L.Rev. 478 (1974) (arguing that legislative label is irrelevant to constitutional protections). We do not mean to dispute the possibility that the positions of professors Goldschmid and Charney could be reconciled. Thus Goldschmid could be read as advising that a legislative label of a sanction as criminal may be applied by the courts as a (non-obligatory) grant of the protections given by the constitution to the criminally accused, and that where such protections would not be required by the constitution, and where Congress does not want to grant these protections, it should label a sanction civil. And Charney could be read only as emphasizing that there are cases in which the constitution should be read as not leaving that decision to Congress.

(1958) (Warren, Black, and Douglas, JJ., dissenting). Thus *Mendoza-Martinez* is quite consistent with the distinction in the *Zucker* to *Helvering* line of cases between monetary penalties and penalties which "directly involve the personal safety of the defendant." Judge Friendly summarized the terms of the prevailing standard:

> When Congress has characterized the remedy as civil and the only consequence of a judgment for the Government is a money penalty, the courts have taken Congress at its word.

*United States v. J. B. Williams, Inc.*, 498 F.2d 414, 421 (2d Cir. 1974) (holding penalties of $456,000 and $356,000 to be civil for constitutional purposes). *See also Frank Irey, Jr., Inc. v. Occupational Safety and Health Review Commission*, 519 F.2d 1200, cert. granted, 424 U.S. 964, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976) (following but not articulating this rule). Defendants thus have no right to a criminal jury trial.

### IV. *Conclusion*

There exist no issues of fact on the record before us to prevent summary judgment. The stipulations of the parties and the concession of the defendants that the administrative assessment process was proper preclude judicial review of the penalties except on issues of law. Defendants' legal contentions, both statutory and constitutional, are without merit. Therefore, we deny the defendants' motions for summary judgment and grant those of the government; and we enforce the penalty assessed by the Coast Guard in each of the cases before us.